## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND )
ETHICS IN WASHINGTON, )
1101 K Street, N.W., Suite 201 )
Washington, DC 20005 )
   )
   )
NATIONAL SECURITY ARCHIVE, )
Gelman Library )
George Washington University )    Civil Action No. _____
2130 H Street, N.W., Suite 701 )
Washington, DC 20037 )
   )
   )
SOCIETY FOR HISTORIANS OF )
AMERICAN FOREIGN RELATIONS, )
Department of History )
Middle Tennessee State University )
1301 East Main Street, Box 23 )
Murfreesboro, TN 37132 )
   )
   )
     Plaintiffs, )
   )
  v. )
   )
MICHAEL R. POMPEO, in his official )
capacity as U.S. Secretary of State, )
2201 C Street, N.W. )
Washington, DC 20520 )
   )
U.S. DEPARTMENT OF STATE, )
2201 C Street, N.W. )
Washington, DC 20520 )
   )
     Defendants. )
_____ )

## COMPLAINT

1.    This an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701,

*et seq.*, and the Federal Records Act, 44 U.S.C. §§ 2101, *et seq.* and §§ 3301, *et seq.* ("FRA"),

challenging as contrary to law the policy and practice of the U.S. Department of State ("State

Department") and Secretary of State Michael R. Pompeo of failing to document State

Department policies, decisions, and essential transactions as the FRA requires. The Defendants'

actions flow from and are directly related to President Donald J. Trump's violations of the

Presidential Records Act, 44 U.S.C. §§ 2201–2209 ("PRA"), which include, *inter alia*, his

decision not to create records of his interactions with autocratic foreign leaders during which he

has solicited their help to advance his own personal and political interests over the interests of

the United States. *See CREW, et al. v. Trump*, Civil No. 19-cv-2333 ABJ (D.D.C.).

2.      Congress enacted and amended the FRA to assure "[a]ccurate and complete

documentation of the policies and transactions of the Federal Government," and "[j]udicious

preservation and disposal of records." 44 U.S.C. §§ 2902(1), (5). To achieve this result, the FRA

requires that "[t]he head of each Federal agency shall make and preserve records containing

adequate and proper documentation of the organization, functions, policies, decisions,

procedures, and essential transactions of the agency . . . ." 44 U.S.C. § 3101. To meet this

obligation, agencies must create and maintain records that "[d]ocument the persons, places,

things, or matters dealt with by the agency[,]" among other types of records. 36 C.F.R. §

1222.22(a).

3.      The public or other interested parties may request the disclosure of agency records

subject to the FRA through the Freedom of Information Act ("FOIA"). *See* 5 U.S.C. § 552(a),

(f). The FOIA's purpose is completely undermined when records that should be accessible

through this mechanism are never created and preserved.

4.      The mandates of the FRA have particular force now, when the need for accurate

records of U.S. foreign policy could not be greater. State Department officials charged with

carrying out our foreign policy should not be left in the dark about shadow diplomacy carried out

through a secret, alternative channel. Creating records of U.S. foreign policy is essential to

ensure that the critical checks and balances built into our system function as the founders intended, and that the public, private researchers, and historians have access to the full documentary history of this administration.

5.    The conduct of Secretary Pompeo and the State Department, however, conflicts directly with their obligations under the FRA. For example, at the direction of President Trump and his personal lawyer, Rudolph ("Rudy") Giuliani, State Department officials, including Ambassador to the European Union Gordon Sondland and former Special Envoy for Ukraine Kurt Volker, and with the knowledge of Secretary Pompeo, have been conducting foreign policy in Ukraine using a secret and irregular channel that bypasses State Department recordkeeping systems and requirements. In at least one instance, Ambassador Sondland, on information and belief acting at the direction of the White House, directed that no one transcribe a call with Ukrainian President Voldymyr Zelenskyy, including State Department officials listening in on or participating in the call. Secretary Pompeo and other State Department officials operated in secrecy to hide the President's involvement in actions designed to pressure President Zelenskyy to assist the President in digging up dirt on his 2020 election opponents. Further, high level State Department officials have been using an encrypted messenger app to conduct official business without ensuring that copies of those messages are saved and preserved in a State Department recordkeeping system, as the FRA requires. Absent the requested relief, the Defendants will not be held accountable for their actions and Plaintiffs and the public will be denied full access to a record of the Defendants' actions.

## JURISDICTION AND VENUE

6.    This Court has personal and subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); 44 U.S.C. §§ 2101, *et*

3

*seq.* and 3301, *et seq.* (the FRA); and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

8.    Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a nonprofit, non-partisan corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions. CREW researches and reviews information made available to the public under the FRA and PRA, including records of former presidents, and uses the FOIA to obtain information about the government that is critical to its mission and purpose. CREW has filed hundreds of FOIA requests since the start of the Trump administration, including with the State Department.

9.    CREW also has a longstanding interest in government compliance with recordkeeping laws, including the FRA and the PRA. CREW has brought numerous lawsuits to compel compliance with these laws. For example, to advance CREW's interest in the creation and preservation of agency records, CREW and the Public Employees for Environmental Responsibility brought a lawsuit challenging the failure of the Environmental Protection Agency and its then-Administrator Scott Pruitt to adequately document EPA policies, decisions, and essential transactions as the FRA requires. *CREW, et al. v. Scott Pruitt, et al.*, Civil No. 18-cv-0406 (JEB) (D.D.C.). The Plaintiffs here also brought a lawsuit pending in this court, *CREW, et al. v. Trump, et al.*, Civil No. 19-cv-1333 ABJ (D.D.C.), that challenges the failure of the

President and the Executive Office of the President to comply with the mandatory, non-discretionary duties the PRA imposes on them. Currently CREW has FOIA requests pending with the Department of State, Department of Defense, and the Office of Management and Budget pertaining to efforts by President Trump to withhold aid to Ukraine unless and until Ukrainian President Zelenskyy agreed to publicly call for an investigation into Hunter Biden and his efforts on behalf of Burisma, a Ukrainian gas company, as well as the President's claim that Ukraine interfered in the 2016 presidential election to aid then-presidential candidate Hillary Clinton.

10.    CREW will continue its practice of submitting FOIA requests for documents from executive branch agencies on matters that relate to CREW's ongoing research, litigation, advocacy, and public education efforts, including the President's ongoing actions to elevate his own personal and political interests over those of the United States.

11.    Plaintiff National Security Archive ("the Archive"), founded in 1985 by journalists and scholars to check rising government secrecy, combines a unique range of functions: investigative journalism, a research institute on international affairs, and a library and archive of declassified U.S. documents that is often considered the world's largest nongovernmental collection of such materials. The Archive is located at the George Washington University, and is one of the leading non-profit users of the FOIA. In these roles, the Archive has established an extraordinary track record of highly credible, award-winning investigative journalism and scholarship, as reflected in its receipt of the George Polk Award in 2000 for "piercing self-serving veils of government secrecy, guiding journalists in search for the truth, and informing us all." Together with its founding director Scott Armstrong, the Archive brought the

series of lawsuits against the Executive Office of the President that resulted in the recognition

that White House email record-keeping practices and guidelines are subject to judicial review.

12.     The Archive has 6,300 FOIA and declassification requests currently pending at

the State Department, most for historical documents. These pending FOIA requests include a

dozen filed in the last month for documents referenced in or related to the complaint of a

whistleblower and statements to Congress by Ambassadors Volker, Sondland, Taylor and

Yovanovich concerning efforts by President Trump to withhold aid to Ukraine. Over the past 30

or more years in which the Archive has been filing FOIA requests, it has filed 13,592 requests

with the State Department out of a total of over 70,000 requests. The Archive's publications,

especially the award-winning Digital National Security Archive database published by ProQuest

(an "Outstanding Academic Title 2018" according to *Choice* magazine), include tens of

thousands of historically valuable State Department documents.

13.     In addition, since its founding, the Archive has filed over 1,300 FOIA and

declassification review requests with the Truman, Eisenhower, Kennedy, Johnson, Nixon, Ford,

Carter, Reagan, George H.W. Bush, Clinton, and George W. Bush Presidential Libraries. The

documents released in response to these requests have illuminated United States foreign policy

and national security history since the Second World War. Among other things, the documents

the Archive acquired from these presidential libraries have shed light on the Cuban Missile

Crisis, the origins of the Vietnam War, President Nixon's opening to China, communications

between the Soviet Union and the United States throughout the Cold War and as the Cold War

ended, and the U.S. role during the human rights atrocities in the former Yugoslavia and

Rwanda. Continued access to a full historical record of each modern presidency and

administration is critical to the Archive's work. The Archive intends to file requests with the

Trump Presidential Library as soon as is legally permitted, likely on a range of topics covering the Trump presidency's foreign policy.

14.     An Archive staffer, Senior Analyst William Burr, has published books and other writings drawing on declassified records of presidential meetings with foreign leaders. One book, *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* (New Press 1998), published for the first time the White House record of President Richard Nixon's meeting with Mao Zedong in February 1972. Another book, *Nixon's Nuclear Specter: The Secret Alert of 1969, Madman Diplomacy, and the Vietnam War* (University Press Kansas 2015), drew upon records kept by National Security Adviser Henry Kissinger of his meetings and telephone conversations with President Nixon. Other publications, such as edited collections of documents posted on the Archive's website, have included declassified records prepared by State Department and White House officials of presidential meetings with foreign leaders.

15.     Plaintiff Society for Historians of American Foreign Relations ("SHAFR") is a professional society dedicated to the study of U.S. foreign relations. On behalf of its nearly 1,000 members, it advances its mission "to promote the study, advancement and dissemination of knowledge about U.S. foreign policy" by awarding research grants and prizes, holding conferences, publishing an academic journal, *Diplomatic History*, and furthering archival access to government documents.

16.     SHAFR's members depend on preservation of and access to records of a president and his administration in order to present a full and accurate accounting of the past in their teaching, public speaking, exhibitions, and publications. SHAFR members have disseminated research findings to the public on the basis of archival research conducted in every presidential library. SHAFR members have filed many thousands of FOIA and mandatory declassification

review requests and have long advocated for the preservation, declassification, and public availability of government records, notably including presidential records, because of the fundamental importance of these records for their investigation of the country's past. Without the proper creation and preservation of government records, SHAFR members will not be able to fulfill their professional responsibility to provide evidence-based assessments of the conduct of U.S. foreign policy during the Trump administration.

17.     SHAFR's journal *Diplomatic History* routinely publishes articles based on new research in presidential libraries, such as a 2017 article by Frédéric Bozo based on FOIA requests relating to Iraq from the Clinton Presidential Library. Recent books published by SHAFR members that are based on records in presidential libraries include Kelly J. Shannon's *U.S. Foreign Policy and Muslim Women's Human Rights*, which used Clinton Library records to trace that administration's global women's rights policies. Books by SHAFR members that rely heavily on accounts of conversations and meetings between U.S. presidents and foreign leaders include Jeffrey Engel's *When the World Seemed New: George H.W. Bush and the End of the Cold War*.

18.     For all Plaintiffs, access to State Department records of diplomatic efforts is essential to fulfill their core missions. The failure of Secretary Pompeo and State Department officials to create and preserve records of their conversations and meetings with certain foreign leaders and of their diplomatic efforts conducted through a secret, irregular channel outside of the agency's recordkeeping system have deprived and will continue to deprive the Plaintiffs of access to the documentary history of this administration. In the process, Plaintiffs and other members of the American public will lose vital information and insight into State Department

policies and decision making, which are critical to interpret and prevent illegal or unwise government action.

19.     Defendant Michael Pompeo is the Secretary of State and is sued in his official capacity only. As Secretary of State, he has an obligation under the FRA to adequately document agency decisions and commitments reached orally and all necessary agency actions the State Department takes. As Secretary of State, Mr. Pompeo also has an obligation under the FRA to maintain a program that adequately documents agency decisions and activities.

20.     Defendant State Department is an agency within the meaning of 5 U.S.C. § 701. The State Department is responsible for implementing Secretary Pompeo's directives and policies, including those drafted pursuant to the obligations the FRA imposes on Secretary Pompeo and the State Department.

## STATUTORY AND REGULATORY FRAMEWORK

### *The Federal Records Act and Implementing Regulations*

21.     Agency records are subject to records creation, maintenance, and destruction rules codified in the FRA, 44 U.S.C. §§ 3101, *et seq*. For the purposes of the FRA, the term records

> includes all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

44 U.S.C. § 3301 (cross-referenced in and applied to chapter 31 of title 44 by 44 U.S.C. § 2901(1)).

22.     The FRA requires that the "head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the

information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101.

23.     Under the FRA, the head of each agency also must "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency." 44 U.S.C. § 3102.

24.     Both the Archivist and the heads of the various executive departments and agencies share responsibility to ensure that an accurate and complete record of each agency's policies and transactions are compiled. *See* 44 U.S.C. §§ 2901, *et seq.*, §§ 3101, *et seq.*

56.     Regulations promulgated by the Archivist describe in greater detail each of the FRA's demands:

> To meet their obligation for adequate and proper documentation, agencies must prescribe the creation and maintenance of records that:
>
> (a) Document the persons, places, things, or matters dealt with by the agency.
>
> (b) Facilitate action by agency officials and their successors in office.
>
> (c) Make possible a proper scrutiny by the Congress or other duly authorized agencies of the Government.
>
> (d) Protect the financial, legal, and other rights of the Government and of persons directly affected by the Government's actions.
>
> (e) Document the formulation and execution of basic policies and decisions and the taking of necessary actions, including all substantive decisions and commitments reached orally (person-to-person, by telecommunications, or in conference) or electronically.
>
> (f) Document important board, committee, or staff meetings.

36 C.F.R. § 1222.22. In addition, the Archivist requires that agency recordkeeping requirements "identify and prescribe specific categories of records to be systematically created or received and maintained by agency personnel in the course of their official duties." 36 C.F.R. § 1222.24(a).

26.     The State Department's implementing guidance, 5 FAM [Foreign Affairs Manual] 422, echoes these requirements and charges "the Department's Records Officer, representing the head of the agency" with ensuring that "'[e]ffective controls over the creation and over the maintenance and use of records in the conduct of current business are provided." 5 FAM 422(2). Under the agency's regulations, those controls must ensure, *inter alia*, that "[i]mportant policies, decisions, and operations are adequately recorded[.]" 5 FAM 422.1(a)(1). Further, the regulations define adequate documentation as, *inter alia*, records that are "complete to the extent necessary to . . . [f]acilitate the making of decisions and policies and the taking of action by the incumbents and their successors in office" and "[p]rovide appropriate documentary materials for research and other historical purposes." 5 FAM 422.2(1).

27.     State Department regulations delegate to each individual employee the responsibility "[w]ithin his or her area of responsibility" to "create and preserve records that properly and adequately document the organization, functions, policies, decisions, procedures, and essential transactions of the Department." 5 FAM 422.3.

28.     With respect to electronic records, State Department regulations impose on all agency personnel the "legal responsibility and a business obligation to ensure documentation of official duties is captured, preserved, managed, and protected in official government systems." 5 FAM 443.2(a). Agency employees are "discouraged from using a personal email account . . . to conduct official business," 5 FAM 443.4(a), but if they do they must copy their "official Government email account . . . during the original creation or transmission[.]" *Id.* at 443.4(d)(2). Those employees who fail to do so at the time of the message's original creation or transmission must

11

forward a complete copy of work-related email (including any attachments) to his or her official Government email account no later than 20 days after the original creation or transmission[.]

*Id.* at 443.4(d)(3).

29.     Congress views the preservation and maint4enance of documents to be of such importance that anyone found guilty of "willfully and unlawfully" concealing, removing, mutilating, obliterating, destroying, or attempting to do any such action against a federal record, can be fined and imprisoned for up to three years. 18 U.S.C. § 2071.

*The Freedom of Information Act*

30.     The FOIA, enacted in 1966, established a statutory right of public access upon request to information held by Executive Branch agencies. Congress enacted the FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The FOIA carries a "strong presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and its "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act," *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

31.     Under the FOIA, virtually every record of a federal agency must be made publicly available, unless it is specifically exempted pursuant to one or more of the FOIA's nine exemptions. 5 U.S.C. § 552(b). Those government entities that fall outside the Administrative Procedure Act's definition of "agency," including the Office of the President, are not subject to the FOIA initially. *See, e.g.*, *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980).

*The Administrative Procedure Act*

32.     The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Such relief is available unless other "statutes preclude judicial review" or the action challenged is "committed to agency discretion by law." 5 U.S.C. § 701.

33.     The term "agency action" under the APA "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." 5 U.S.C. § 551 (emphasis supplied). *See also* 5 U.S.C. § 701 (cross-referencing the definitions at § 551).

34.     A court reviewing a claim brought under 5 U.S.C. § 702 "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.*

35.     The APA authorizes judicial review of properly pleaded claims that an agency has violated its non-discretionary obligations under the FRA, including the failure to "make . . . records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" *Armstrong v. Bush*, 924 F.2d 282, 285 (D.C. Cir. (1991)) ("*Armstrong I*").

## FACTUAL BACKGROUND

36.     On August 12, 2019, a whistleblower who works within the intelligence

community filed a complaint with the Office of the Inspector General of the Intelligence

Community ("ICIG") reporting an "urgent concern" that "the President of the United States is

using the power of his office to solicit interference from a foreign country in the 2020 U.S.

election." Whistleblower Complaint, https://bit.ly/2Nspbt. *See also* Press Release, House

Intelligence Committee Releases Whistleblower Complaint, House Permanent Select Committee

on Intelligence (Sept. 26, 2019), https://bit.ly/2WAcj8Z. The ICIG deemed the complaint

credible and a matter of "urgent concern," thereby triggering a requirement to notify the

appropriate congressional oversight committees. Greg Miller, Ellen Nakashima, and Shane

Harris, Trump's communications with foreign leader are part of whistleblower complaint that

spurred standoff between spy chief and Congress, former officials say, *Washington Post* (Sept.

18, 2019), https://wapo.st/2kos98a.

37.     In the complaint, which was submitted to the ICIG on August 12, 2019, and

released to the public by the House Permanent Select Committee on Intelligence on September

26, 2019, the whistleblower asserts that he or she has "received information from multiple U.S.

Government officials that the President of the United States is using the power of his office to

solicit interference from a foreign country in the 2020 U.S. election. This interference includes,

among other things, pressuring a foreign country to investigate one of the President's main

domestic political rivals." Whistleblower Complaint at 1.

38.     The whistleblower described a telephone call between President Trump and

Ukrainian President Volodymyr Zelenskyy on July 25, 2019, in which "after an initial exchange

of pleasantries, the President used the remainder of the call to advance his personal interests.

Namely, he sought to pressure the Ukrainian leader to take actions to help the President's 2020

reelection bid." Those actions included pressuring the Ukrainian president: (1) to "initiate or

continue an investigation into the activities of former Vice President Joseph Biden and his son,

Hunter Biden"; (2) to "assist in purportedly uncovering that allegations of Russian interference

in the 2016 U.S. presidential election originated in Ukraine"; and (3) to "meet or speak with two

people the President named explicitly as his personal envoys on these matters, Mr. Giuliani and

Attorney General Barr." Whistleblower Complaint at 2.

      39.     In a section on circumstances leading up to the July 25 telephone call, the

whistleblower noted that he or she learned in mid-July "of a sudden change of policy with

respect to U.S. assistance," which was described in more detail in an appendix. Whistleblower

Complaint at 7. Specially, the whistleblower wrote,

> On 18 July, an Office of Management and Budget (OMB) official informed
> Departments and Agencies that the President 'earlier that month' had issued
> instructions to suspend all U.S. security assistance to Ukraine. Neither OMB nor
> the [National Security Council] staff knew why this instruction had been issued.
> During interagency meetings on 23 July and 26 July, OMB officials again stated
> explicitly that the instruction to suspend this assistance had come directly from the
> President, but they still were unaware of a policy rationale. As of early August, I
> heard from U.S. officials that some Ukrainian officials were aware that U.S. aid
> might be in jeopardy[.]"

*Id.*, Classified Appendix at 2.

      40.     The Whistleblower Complaint further alleges that White House officials may

have abused recordkeeping systems to conceal the President's actions. Officials reportedly were

"deeply disturbed by what had transpired" on the July 25 phone call and there was "a 'discussion

ongoing' with White House lawyers about how to treat the call because of the likelihood . . . that

they had witnessed the President abuse his office for personal gain." Whistleblower Complaint at

3. According to the complaint, although "approximately a dozen White House officials" and "a

State Department official, Mr. T. Ulrich Brechbuhl," listened to the call, and multiple State

Department and Intelligence Community officials were "briefed on the contents of the call," *id.*

at 3, "senior White House officials . . . intervened to 'lock down' all records of the phone call,

especially the official word-for-word transcript of the call that was produced—as is customary—

by the White House Situation Room." *Id.*

41.     More specifically, the Whistleblower Complaint alleges that

> White House officials told me that they were "directed" by White House lawyers
> to remove the electronic transcript from the computer system in which such
> transcripts are typically stored for coordination, finalization, and distribution to
> Cabinet-level officials.

> Instead, the transcript was loaded into a separate electronic system that is otherwise
> used to store and handle classified information of an especially sensitive nature.
> One White House official described this act as an abuse of this electronic system
> because the call did not contain anything remotely sensitive from a national security
> perspective.

*Id.* at 3—4.  Recent congressional testimony from Army Lt. Col. Alexander Vindman, the

Director of European Affairs for the National Security Council, confirms that it was White

House lawyer John Eisenberg who directed that the transcript be moved to the highly classified

server. Carol D. Leonnig, Tom Hamburger, and Greg Miller, White House lawyer moved

transcript of Trump call to classified server after Ukraine adviser raised alarms, *Washington Post*

(Oct. 30, 2019), https://wapo.st/2NvaCWz.

42.     The classified appendix to the Whistleblower Complaint provides further detail

about these recordkeeping practices:

> According to multiple White House officials I spoke with, the transcript of the
> President's call with President Zelenskyy was placed into a computer system
> managed directly by the National Security Council (NSC) Directorate for
> Intelligence Programs. This is a standalone computer system reserved for
> codeword-level intelligence information, such as covert action. According to
> information I received from White House officials, some officials voiced concerns
> internally that this would be an abuse of the system and was not consistent with the

responsibilities of the Directorate for Intelligence Programs. *According to White House officials I spoke with, this was "not the first time" under this Administration that a Presidential transcript was placed into this codeword-level system solely for the purpose of protecting politically sensitive—rather than national security sensitive—information.*

*Id.*, Classified Appendix at 1 (emphasis added).

43.      Public reporting in the wake of the release of the Whistleblower Complaint suggests that the White House took additional, unusual action with respect to other records of President Trump's telephone calls with foreign leaders. According to the *Washington Post*, "[a]t one point in 2018, Defense Department officials were asked to send back transcripts of calls to the White House after Trump aides grew worried they could be disclosed, according to former senior administration officials." Josh Dawsey and Carol D. Leonnig, Effort to shield Trump's call with Ukrainian leader was part of broader secrecy effort, *Washington Post* (Sept. 26, 2019), https://wapo.st/2mjte1V. Such efforts reportedly are the result of the President pressing aides to ensure that records do not become public. *Id.* Transferring records to the National Security Council's code-word-protected system reportedly requires a written request from a senior White House official such as the chief of staff or the national security adviser. *Id.* The *New York Times* reported that records of calls between President Trump and President Putin and between President Trump and Saudi Crown Prince Mohammed bin Salman are among the records that have been placed in a highly classified computer system. Julian E. Barnes, Michael Crowley, Matthew Rosenberg, and Mark Mazzetti, White House Classified Computer System Is Used to Hold Transcripts of Sensitive Calls, *New York Times* (Sept. 27, 2019), https://nyti.ms/2mnvo0K. *See also* Pamela Brown, Jim Sciutto, and Kevin Liptak, White House restricted access to Trump's calls with Putin and Saudi crown prince, *CNN* (Sept. 28, 2019), https://cnn.it/2lK3cVo.

44.     In a similar vein, after his first reported face-to-face meeting with President Putin in Hamburg, Germany in July 2017 during the G-20 Summit, President Trump confiscated his interpreter's notes and ordered the interpreter not to disclose to anyone what he had heard, including to administration officials. Peter Baker, <u>Trump and Putin Have Met Five Times, What Was Said Is a Mystery</u>, *New York Times* (Jan. 15, 2019) <u>https://nyti.ms2pnsN8F</u>; Greg Miller, <u>Trump has concealed details of his face-to-face encounters with Putin from senior officials in administration</u>, *Washington Post* (Jan. 13, 2019), <u>https://wapo.st/2JDPYlM</u>. The interpreter for that summit, as with every meeting President Trump has with foreign leaders, was an employee or contractor of the State Department. *See* 6 FAM 1530, Assignment of Interpreters to Official Visits and High-Level Meetings.

45.     After the Whistleblower Complaint was filed, the Acting Director of National Intelligence, the White House, and the Department of Justice ("DOJ") took steps to prevent Congress from accessing the complaint. On August 26, 2019, Intelligence Community Inspector General Michael K. Atkinson disclosed the Whistleblower Complaint to Acting Director of National Intelligence Joseph Maguire. ICIG August 26, 2019 Letter to Acting Director Maguire, at 1, <u>https://bit.ly/2qfn30M</u>. Even though federal law requires the Director of National Intelligence ("DNI") to transmit to Congress a whistleblower complaint deemed by the inspector general to be a matter of urgent concern and credible, *see* 50 U.S.C. § 3033(k)(5), Acting Director Maguire failed to do so within the prescribed statutory deadline. Instead, Acting Director Maguire consulted the White House and DOJ's Office of Legal Counsel. Zachary Cohen, <u>Acting spy chief tells Congress the 'whistleblower did the right thing'</u>, *CNN* (Sept. 26, 2019), <u>https://cnn.it/2nbAAVB</u>.

46.     On September 25, 2019, the White House released a memorandum of the President's July 25, 2019 telephone conversation with President Zelenskyy ("Zelenskyy

Memcom"), https://bit.ly/2PD14xV. According to the Zelenskyy Memcom, after President

Zelenskyy acknowledged the United States' "great support in the area of defense," and his

readiness "to continue to cooperate," including by "buy[ing] more Javelins from the United

States for defense purposes," President Trump responded as follows:

> I would like you to do us a favor though because our country has been through a lot and Ukraine knows a lot about it. I would like you to find out what happened with this whole situation with Ukraine, they say Crowdstrike . . . I guess you have one of your wealthy people . . . The server, they say Ukraine has it. There are a lot of things that went on, the whole situation. I think you're surrounding yourself with some of the same people. I would like to have the Attorney General call you or your people and I would like you to get to the bottom of it. As you saw yesterday, that whole nonsense ended with a very poor performance by a man named Robert Mueller, an incompetent performance, but they say a lot of it started with Ukraine. Whatever you can do, it's very important that you do it if that's possible.

Zelenskyy Memcom at 2—3.

47.    The Zelenskyy Memcom also confirms the whistleblower's description of the

President's efforts to induce President Zelenskyy to dig up dirt on Joe and Hunter Biden. After

asking President Zelenskyy to take calls from his personal lawyer, Rudy Giuliani, and from

Attorney General William Barr the President stated: "There's a lot of talk about Biden's son, that

Biden stopped the prosecution and a lot of people want to find out about that so whatever you

can do with the Attorney General would be great." Zelenskyy Memcom. at 3—4.

48.    On September 24, 2019, House Speaker Nancy Pelosi announced that the House

was initiating a formal impeachment inquiry against President Trump based on his efforts to

enlist the Ukrainian government to tarnish his political rival Joe Biden. She noted that the

"sequencing of events," including President Trump's decision to withhold aid days before his

telephone call with President Zelenskyy, is a part of the investigation. Scott Pelley, The

Impeachment Inquiry: "We Could Not Ignore What the President Did", *CBS News* (Sept. 30, 2019), https://cbsn.ws/2BGP6IJ.

49.     As part of the impeachment inquiry, the House has conducted interviews with a number of people with knowledge of the events the Whistleblower Complaint describes, including, *inter alia*, Ambassador Gordon Sondland, former Ambassador to Ukraine Marie Yovanovitch, former National Security Council advisor Dr. Fiona Hill, Ambassador William Taylor, the U.S. top envoy to Ukraine, and Army Lt. Col. Vindman. Each has provided startling details that corroborate and expand on the actions of the President and others acting at his direction that the Whistleblower Complaint outlines. Broadly speaking, they described efforts by President Trump and top administration officials to pressure foreign leaders to act in a way that advances the President's personal interests to the detriment of the interest and security of the United States.

50.     For example, on October 14, 2019, Dr. Hill testified to a meeting she attended on July 10, 2019, along with then-National Security Advisor John Bolton, Ambassador Sondland, and "senior Ukrainian officials" during which Ambassador Sondland made clear his desire that the Ukrainians look into Joe and Hunter Biden as part of a larger plan "he, Giuliani, and acting chief of staff Mick Mulvaney were executing." Alex Ward, Former White House official bolsters the Trump-Ukraine whistleblower's allegations, *Vox* (Oct. 15, 2019), https://bit.ly/2N743KU. Following the meeting, Mr. Bolton advised Dr. Hill to tell the National Security Council's top lawyer, John Eisenberg, about his discomfort with what he described as a "drug deal Sondland and Mulvaney are cooking up[.]" *Id.* In her congressional testimony Dr. Hill also described a conversation she had had with Ambassador Sondland in which he said he was in charge of Ukraine policy under the authority of President Trump. *Id.*

51.    On October 22, 2019, Ambassador Taylor also testified as part of Congress' impeachment inquiry. His opening statement offers a wealth of detail about the events described in the Whistleblower Complaint, corroborating the whistleblower's information about a White House directive to withhold assistance to Ukraine. *Opening Statement of Ambassador William B. Taylor - October 22, 2019*, *Washington Post* (Oct. 23, 2019), https://wapo.st/2PcfUZk ("Taylor Opening Statement").

52.    Most significantly for purposes of the FRA, Ambassador Taylor described diplomatic efforts in Ukraine that involved an "irregular" or shadow diplomatic channel that was pursuing in secret a different goal than the "regular" diplomatic channel Ambassador Taylor and other State Department officials were using. As an example, in his congressional testimony Ambassador Taylor described a telephone call with President Zelenskyy on June 28 that included, in addition to Ambassador Taylor, Ambassadors Sondland and Volker and Energy Secretary Rick Perry. He noted how odd it was that Ambassador Sondland was not including "most of the regular interagency participants" in the call and further that "Ambassador Sondland said that he wanted to make sure no one was transcribing or monitoring as they added President Zelenskyy to the call." Taylor Opening Statement at 5.

53.    Ambassador Taylor laid out the sequence of events that pre- and post-dated President Trump's July 25 telephone call with President Zelenskyy. He explained that an OMB official relayed the White House decision to withhold aid to him and other officials in an interagency meeting on July 18, 2019, although the OMB official "could not say why" the hold was in place but that the "directive had come from the President to the Chief of Staff [and Director of OMB, Mick Mulvaney,] to OMB." *Id.* at 6; *see also* Karoun Demirjian, Josh Dawsey, Ellen Nakashima, and Carol D. Leonig, Trump Ordered Hold on Military Aid Days

21

Before Calling Ukrainian President, Officials Say, *Washington Post* (Sept. 23, 2019),

https://wapo.st/31I3T0g.

54.     According to Ambassador Taylor, a series of interagency meetings followed the

OMB's announcement in which "the unanimous conclusion was that the security assistance

should be resumed, the hold lifted. At one point, the Defense Department was asked to perform

an analysis of the effectiveness of the assistance. Within a day, the Defense Department came

back with the determination that the assistance was effective and should be resumed. . . . [T]he

Secretaries of Defense and State, the CIA Director, and the National Security Advisor sought a

joint meeting with the President to convince him to release the hold, but such a meeting was hard

to schedule and the hold lasted well into September." Taylor Opening Statement at 6-7.

55.     Ambassador Taylor explained that he ultimately came to understand that the hold

on security assistance was explicitly tied to the Ukrainians' willingness to investigate the Bidens

and alleged Ukrainian interference in the 2016 U.S. election. *Id.* at 11-14. He described a series

of exchanges in which Ambassador Sondland explained that "everything"—including security

assistance—was dependent on President Zelenskyy's public announcement of such

investigations, and that he, Ambassador Sondland, had advised President Zelenskyy to tell

President Trump that Ukraine would "leave no stone unturned" with respect to "investigations."

*Id.* at 8-13. Ambassador Taylor later learned the details of President Trump's July 25 call with

President Zelenskyy, after the White House released a rough transcript of the call on September

25, 2019. *Id.* at 14.

56.     Significantly, Ambassador Taylor described a process in which Ambassador

Sondland engaged President Zelenskyy as part of an "irregular, informal channel of U.S. policy-

making" that also included then-Special Envoy Kurt Volker, Secretary of Energy Perry, and

President Trump's personal lawyer Rudy Giuliani. *Id.* at 4. Ambassador Taylor described the

existence of this irregular diplomatic channel as "confusing and ultimately alarming[.]" *Id.* at 3.

Although "well-connected in Washington," the irregular channel "operated mostly outside of

official State Department channels," and "began when Ambassador Volker, Ambassador

Sondland, Secretary Perry, and Senator Ron Johnson briefed President Trump on May 23 upon

their return from President Zelenskyy's inauguration." *Id.* at 4.

57.     According to Ambassador Taylor, by August 2019, the regular and the irregular

channels "had diverged in their objectives," causing him to become "increasingly concerned." *Id.*

at 4—5. While the two channels started off sharing the goal of a meeting between Presidents

Trump and Zelenskyy, Ambassador Taylor soon learned that President Trump would not agree to

such a meeting until President Zelenskyy agreed to "cooperation on investigations to 'get to the

bottom of things.'" *Id.* at 5. By mid-July Ambassador Taylor finally learned precisely what this

meant, specifically "that the meeting President Zelenskyy wanted was conditioned on the

investigations of Burisma and alleged Ukrainian interference in the 2016 U.S. elections." *Id.* at 6.

It also was clear to him by that time "that this condition was driven by the irregular policy

channel I had come to understand was guided by Mr. Giuliani." *Id.*

58.     Similarly, Ambassador Taylor subsequently learned in a July 19 telephone call

with Dr. Hill and Army Lt. Col. Vindman, that "Ambassador Volker had met with Mr. Giuliani

to discuss Ukraine." When Ambassador Taylor followed up with Ambassador Volker about the

meeting and when he received no response he realized "that the two decision making channels—

the regular and irregular—were separate and at odds." *Id.* at 7.

59.     Although Ambassador Taylor is the Chief of Mission in Ukraine, he described in

his congressional testimony how much in the dark he was about the conditions President Trump

had placed on any meeting with President Zelenskyy. He also expressed his growing distress

with President Trump's "insist[ence] that President Zelenskyy go to a microphone and say he is

opening investigations of Biden and 2016 election." *Id.* at 12. Ambassador Taylor understood

that unless President Zelenskyy "'clear[ed] things up' in public," they would be at a "stalemate,"

which he understood "to mean that Ukraine would not receive the much-needed military

assistance." *Id.* Ambassador Taylor told Ambassadors Sondland and Volker, "I think it's crazy to

withhold security assistance for help with a political campaign." *Id.* at 13.

60.     Congressional testimony also has revealed that Ambassadors Volker and

Sondland along with Mr. Giuliani communicated using an encrypted messenger app, WhatsApp.

On October 3, 2019, the Chairs of the House Committee on Foreign Affairs, the House

Permanent Select Committee on Intelligence, and the House Committee on Oversight and

Reform sent a letter to the members of the three Committees that included as an attachment text

messages from Ambassador Volker to Ambassadors Taylor and Sondland, Andrey Yermak, an

aide to President Zelenskyy, and Rudy Giuliani. Letter to Members of the Intelligence, Oversight

and Reform, and Foreign Affairs Committees ("Oct. 3 House Letter"), https://bit.ly/2r2d2El.

Those text messages further evidence the irregular or shadow diplomacy channel that was used

to, among other things, place pressure on Ukraine "to deliver on the President's demand for

Ukraine to launch politically motivated investigations." Oct. 3 House Letter at 2.

61.     The circumstances under which the State Department eventually acquired copies

of these messages make clear they were not placed into a State Department recordkeeping

system upon or even shortly after their creation. It was only after Ambassadors Volker,

Sondland, and others received congressional subpoenas to produce the records as part of the

House impeachment inquiry that they provided at least some  officials at the State Department with copies.

62.     Reportedly, the use of personal phones and an encrypted messenger app is widespread at the State Department both during the conduct of U.S. policy on Ukraine and for the conduct of other State Department business. *See* John Hudson and Karoun Demirjian, Clinton-email critics pull a role reversal as Trump administration draws fire for private phone use, *Washington Post* (Oct. 9, 2019), https://wapo.st/2Wyp3Nz.

63.     This conduct appears to mirror that of other government officials who used encrypted communications in a way that stymied the investigation of Special Counsel Robert Mueller. In his *Report on the Investigation Into Russian Interference In the 2016 Presidential Election*, Mr. Mueller noted in his executive summary, "the Office learned that some of the individuals we interviewed or whose conduct we investigated—including some associated with the Trump Campaign—deleted relevant communications or communicated during the relevant period using applications that feature encryption or that do not provide for long-term retention of data or communications records." *Id.*, Executive Summary to Volume I at 10.

64.     Congressional testimony in the impeachment proceeding from Acting Assistant Secretary of European and Eurasian Affairs Philip Reeker has addressed at least in part Secretary Pompeo's role in the administration's dealings with Ukraine. Mike Lillis, State Dept. official broached Pompeo's role in Ukraine in new testimony, *The Hill* (Oct. 26, 2019), https://bit.ly/2C5iUPo. Secretary Pompeo removed the former Ambassador to Ukraine Marie Yovanovitch "after she voiced concerns that the administration had crossed a line in enlisting foreign help to boost Trump's 2020 campaign." *Id.* Reportedly Mr. Reeker led an effort to rally support for Yovanovitch but "was urged not to by top State Department officials[.]" Vivian

Salama, State Department's Philip Reeker Testified Top Officials Blocked Show of Support for Ousted Ambassador, *Wall Street Journal* (Oct. 27, 2019), https://on.wsj.com/2PCSFb3.

65.     Secretary Pompeo initially denied any familiarity with the details of the Whistleblower Complaint, but finally admitted he was among the officials who listened in on the July 25 phone call. Deirdre Shesgreen, 'I was on the phone call': Pompeo acknowledges he was listening to Trump's phone call with Ukraine president, *USA Today* (Oct. 2, 2019), https://bit.ly/2JGcM4. For his part, Rudy Giuliani has claimed that he did not talk to a Ukrainian official "until the State Department called me and asked me to do it," after which he "reported to every conversation back to them." Justin Garagona, Rudy Giuliani: State Department 'Asked Me' to Look Into Ukraine, *Daily Beast* (Sept. 25, 2019), https://bit.ly/36xHE0Q. Despite his involvement, Secretary Pompeo has ignored calls for him to recuse himself from Ukraine-related matters. Shesgreen, *USA Today*, Oct. 2, 2019.

66.     Accurate records of the United States' interactions with foreign leaders and their representatives are a matter of extreme importance for the nation's foreign policy and for the historical record. As Ambassador Taylor demonstrated in his congressional testimony, timely access to information about ongoing diplomatic efforts is critical in advancing and protecting the interests of the United States, including its national security interests. Ambassador Taylor described the "strategic importance of Ukraine in our effort to create a whole, free Europe," which in the past the United States has advanced "with assistance funding, both civilian and military, and political support." Taylor Opening Statement at 15. The "side channels" along with "quid pro quos, corruption, and interference in elections," *id.* at 14, hinder those efforts.

67.     Those interests are heightened in a presidency that has been marked by departures from the normal procedures of international diplomacy, including the use of a shadow, irregular,

and "off-the-books" channel to conduct foreign diplomacy in an effort to conceal the efforts by

the President and other top aids to enlist the aid of autocratic foreign leaders to advance the

President's personal and political interests. For example, Senior White House Advisor Jared

Kushner, whom the President has charged with bringing peace to the Middle East, earlier this

year met in Saudi Arabia with Saudi Crown Prince Mohammed bin Salman and King Salman.

According to a White House statement, the three discussed "the peace efforts, as well as

American-Saudi cooperation and plans to improve conditions in the region through investment."

Ben Hubbard, Kushner Met With Saudi Crown Prince to Push Mideast Peace Plan, *New York

Times* (Feb. 27, 2019), https://nyti.ms/2N8dgT2. Reportedly U.S. embassy staff in Riyadh "were

not read in on the details of Jared Kushner's trip . . . or the meetings he held with members of the

country's Royal Court[.]" Erin Banco, Embassy Staffers Say Jared Kushner Shut Them Out of

Saudi Meetings, *Daily Beast* (Mar. 7, 2019), https://bit.ly/2NuPzmZ. The only State Department

official who was allowed to attend the meeting is someone who focuses on Iran. *Id.* As a result,

the U.S. embassy "was largely left in the dark on the details of Kushner's schedule and his

conversations with Saudi officials[.]" *Id.*

68.     Moreover, like top State Department officials, Mr. Kushner reportedly also used

the encrypted message service WhatsApp as well as a personal email account to conduct official

business, including to communicate with Saudi Crown Prince Mohammed bin Salman. Andrew

Desiderio and Kyle Cheney, Cummings demands docs on Kushner's alleged use of encrypted

app for official business, *Politico* (Mar. 21, 2019), https://politi.co/2qcLLyC. White House

Advisor Ivanka Trump also reportedly conducts official White House business through a

personal email account, as did former Deputy National Security Adviser K.T. McFarland when

communicating about the transfer of "'sensitive U.S. nuclear technology to Saudi Arabia,'" *id*,

notwithstanding the statutory requirement that they use only their official electronic message accounts, except in certain specifically prescribed circumstances. 44 U.S.C. § 2209(a).

## PLAINTIFFS' CLAIMS FOR RELIEF

### CLAIM ONE
**(For a Declaratory Judgment that the Pattern and Practice of Defendants Pompeo and the State Department of Affirmatively Electing Not to Create and Preserve Records Adequately Documenting the Organization, Functions, Policies, Decisions, Procedures, and Essential Transactions of the State Department Is Arbitrary, Capricious and Contrary to the FRA and for an Order Compelling Defendants Pompeo and the State Department to Affirmatively Electing Not to Create and Preserve Records Adequately Documenting the Organization, Functions, Policies, Decisions, Procedures, and Essential Transactions of the State Department)**

69.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

70.     The FRA requires the head of each federal agency to both make and preserve as federal records all records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency. 36 C.F.R. § 1222.22. They also must document the formulation and execution of basic policies and decisions and the taking of necessary actions, including all substantive decisions and commitment reached orally (person-to-person, by telecommunications, or in conference) or electronically. *Id.* They must also identify and prescribe specific categories of records that must be systematically created or received and maintained by agency personnel. 36 C.F.R. § 1222.24(a).

71.     Despite these unambiguous requirements, Secretary Pompeo and other State Department officials have followed a pattern and practice of affirmatively electing not to create and preserve records adequately documenting the organization, functions, policies, decisions, procedures, and essential transactions of the State Department, to keep secret the shadow diplomacy being conducted in furtherance of the President's personal and political interests.

72.     Secretary Pompeo and other top State Department officials also have directed other State Department employees not to create and preserve records adequately documenting the organization, functions, policies, decisions, procedures, and essential transactions of the State Department, to keep secret the shadow diplomacy being conducted in furtherance of the President's personal and political interests.

73.     Further, Secretary Pompeo and other top State Department officials have failed to identify and prescribe specific categories of records to be systematically created or received and maintained by agency personnel, creating circumstances in which State Department employees have participated in a shadow diplomacy being conducted in furtherance of the President's personal and political interests.

74.     As a result, plaintiffs have been denied present and future access to important agency documents that would shed light on the conduct of State Department officials and the reasons for their actions and decisions.

75.     Plaintiffs therefore are entitled to a declaration that defendants Secretary Pompeo and the State Department are in violation of their statutory duties under 44 U.S.C. §§ 3101, 3301 and implementing NARA regulations, 36 C.F.R. § 1222.22, and an order compelling them to make and preserve as federal records all records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the State Department.

**CLAIM TWO**
**(For a Declaratory Judgment that Defendants Pompeo and the State Department Have Failed to Establish and Maintain an Adequate Program to Preserve Federal Records In Compliance With the FRA and For an Order Compelling Defendants Pompeo and the State Department to Establish and Maintain an FRA-Compliant Program)**

76.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

77.     The FRA requires the head of each federal agency to establish and maintain a

records management program that provides for effective controls over the agency's records and

to cooperate with the Archivist in applying standards and procedures for the maintenance and

security of the records deemed appropriate for preservation. 44 U.S.C. § 3102. The head of each

federal agency also must establish safeguards against the removal or loss of records the agency

head determines to be necessary and required by regulations the Archivist promulgates. 44

U.S.C. § 3105.

78.     Notwithstanding the evidence of widespread non-compliance at the State

Department with recordkeeping requirements, particularly with respect to the use of private

phones and email accounts and encrypted messenger apps to send messages, the State

Department through agency regulations has delegated to each agency employee the apparently

unchecked discretion to "create and preserve records that properly and adequately document the

organization, functions, policies, decisions, procedures, and essential transactions of the

Department." 5 FAM 422.3. The lack of effective controls over the agency's records program

has resulted in the absence of records explaining or documenting key functions, policies,

decisions, procedures, and essential transactions of the State Department, thereby depriving

plaintiffs of present and future access to important agency documents that would shed light on

the conduct of State Department officials and the bases for their actions and decisions.

79.     Plaintiffs therefore are entitled to a declaratory order that the failure of Secretary

Pompeo and the State Department to maintain a program to adequately document agency

decisions and activities is in violation of 5 U.S.C. §§ 702, 706, and an injunction compelling

Secretary Pompeo and the State Department to maintain a records management program to

adequately document agency decisions and activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that the Defendants' policy and practice of failing to create and preserve records adequately and properly documenting the organization, functions, policies, decisions, procedures, and essential transactions of the State Department violates the FRA.

2.      Issue injunctive relief compelling Secretary Pompeo and the State Department to maintain an adequate and proper record of the State Department's organization, functions, policies, decisions, procedures, and essential transactions.

3.      Declare that Defendants have failed to maintain a program to adequately document the State Department's organization, functions, policies, decisions, procedures, and essential transactions.

4.      Issue injunctive relief compelling Secretary Pompeo and the State Department to maintain a program to adequately document the State Department's organization, functions, policies, decisions, procedures, and essential transactions.

5.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann, D.C. Bar No. 298190
Conor M. Shaw, D.C. Bar No. 1032074
1101 K Street, N.W., Suite 201
Washington, D.C. 20005
Phone: (202) 408-5565
Email: aweismann@citizensforethics.org
Email: cshaw@citizensforethics.org

BAKER & McKENZIE LLP

31

George M. Clarke III, D.C. Bar No. 480073
Mireille R. Oldak, D.C. Bar No. 1027998
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 835-6184
Fax: (202) 416-7184
Email: george.clarke@bakermckenzie.com
Email: mireille.oldak@bakermckenzie.com

*Attorneys for Plaintiffs*

**Dated:** November 5, 2019