**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, *et al.*,<br><br><br>               Plaintiffs,<br><br>    v.<br><br>MICHAEL R. POMPEO, *et al.*,<br><br><br>               Defendants. | Civil Action No. 19-3324 (JEB) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ................................................. 2

FACTUAL BACKGROUND .......................................................................................... 4

ARGUMENT ................................................................................................................... 8

  I.   Standard of Review ............................................................................................... 8

  II.  Claim One States a Viable, Judicially Reviewable Claim Under the
        Administrative Procedure Act for Violations by Defendants of Their
        Mandatory Duties Under the FRA to Create Records. .................................... 9

     A.  Applying Freedom of Information Act Precedent, Plaintiffs Have Properly
          Alleged a Policy and Practice Claim. .......................................................... 9

     B.  Plaintiffs Have Sufficiently Pleaded on Information and Belief to Survive
          Defendants' Motion to Dismiss. .................................................................. 15

     C.  The Limited Publicly Available Factual Record Adequately Supports
          Plaintiffs' Policy and Practice Claim. ........................................................ 17

     D.  Judicial Review of Plaintiffs' Policy and Practice Claim Accords Fully with
          the Armstrong Decisions and the APA. ...................................................... 20

  III.  Claim Two States a Justiciable, Plausible, and Live Challenge to the
         Adequacy of Defendants' Records Management Program and Controls. .... 24

CONCLUSION .............................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abhe & Svoboda, Inc. v. Choa*,
  508 F.3d 1052 (D.C. Cir. 2007)................................................................................9

*Am. Ctr. for Law & Justice v. United States*,
  289 F. Supp. 3d 81 (D.D.C. 2018)............................................................................11

*Armstrong v. Bush*,
  924 F.2d 282 (D.C. Cir. 1991)...........................................................................13, 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................27, 29, 30

*Bancroft Glob. Dev. v. United States*,
  330 F. Supp. 3d 82 (D.D.C. 2018)......................................................................15, 16

*Baumel v. Syrian Arab Republic*,
  667 F. Supp. 2d 39 (D.D.C. 2009)............................................................................15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................9, 15, 17

*Bufco Corp. v. NLRB*,
  147 F.3d 964 (D.C. Cir. 1998)..................................................................................16

*Cody v. Cox*,
  509 F.3d 606 (D.C. Cir. 2007)..................................................................................31

*Competitive Enter. Inst. v. EPA*,
  67 F. Supp. 3d 23 (D.D.C. 2014) . Ds' Mem.......................................................12, 13

*Covad Commc'ns Co. v. Bell Atlantic Co.*,
  407 F.3d 1220 (D.C. Cir. 2005).................................................................................9

*CREW v. DHS*,
  387 F. Supp. 3d 33 (D.D.C. 2019)......................................................................22, 23

*CREW v. Pompeo*,
  No. 19-3324, 2020 WL 1667638 (D.D.C. Apr. 3, 2020)..........................10, 12, 26, 27

*CREW v. Pruitt*,
  319 F. Supp. 3d 252 (D.D.C. 2018)................................................................. *passim*

*CREW v. Wheeler*,
    352 F. Supp. 3d 1 (D.D.C. 2019) ..............................................................18, 23, 24, 28

*Evangelou v. Dist. of Columbia*,
    901 F. Supp. 2d 159 (D.D.C 2012) ...........................................................................15

*Garcia v. Acosta*,
    393 F. Supp. 3d 93 (D.D.C. 2019) ............................................................................10

*Graves v. United States*,
    150 U.S. 118 (1893) ...................................................................................................16

*Hurd v. Dist. of Columbia*,
    864 F.3d 671 (D.C. Cir. 2017) .............................................................................8, 17

*Johnson v. Comm'n on Presidential Debates*,
    202 F. Supp. 3d 159 (D.D.C. 2016) ............................................................................8

*Judicial Watch, Inc. v. FBI*,
    No. 18-2316, 2019 WL 4194501 (D.D.C. Sept. 4, 2019) .....................................25, 26

*Judicial Watch, Inc. v. DHS*,
    895 F.3d 770 (D.C. Cir. 2018) ...................................................................................11

*Mintz v. FDIC*,
    729 F. Supp. 2d 276 (D.D.C. 2010) .............................................................................9

*Payne Enterprises, Inc. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) .............................................................................11, 14

*Powell v. McCormack*,
    395 U.S. 486 (1969) ...................................................................................................31

*Venetian Casino Resort LLC v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) ...................................................................................14

**Statutes**

22 U.S.C. § 2651a ..............................................................................................................28

44 U.S.C. § 2901(1) .............................................................................................................2

44 U.S.C. § 2902 ...............................................................................................................29

44 U.S.C. § 3101 ............................................................................................................2, 22

44 U.S.C. § 3102 ...........................................................................................12, 25, 28, 29

44 U.S.C. § 3105 ...............................................................................................................25

44 U.S.C. § 3301 ....................................................................................................2

**Reguations**

36 C.F.R. § 1220.32 ........................................................................................25, 30

36 C.F.R. § 1220.34 ........................................................................................25, 31

36 C.F.R. § 1222.22 ..............................................................................................3

36 C.F.R. § 1222.24(a)(1) ....................................................................................3

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
    § 1224 (3d ed. 2004) ....................................................................................16

5 FAM 422 .............................................................................................................3

5 FAM 422(2) ........................................................................................................3

5 FAM 422.1(a)(1) ................................................................................................3

5 FAM 422.2 ..........................................................................................................3

5 FAM 422.2(a) .....................................................................................................4

5 FAM 422.2(b)(1) ................................................................................................4

5 FAM 422.2(b)(2) ................................................................................................4

5 FAM 422.2(c) .....................................................................................................4

5 FAM 422.3 ..........................................................................................................3

Ana Swanson and Alan Rappeport, *Trump's Trade Appeals to China Still
    Left Farmers Reeling*, N.Y. Times, June 19, 2020 ....................................19

Fed. R. Evid. 201(b)(2) .........................................................................................9

Press Statement, Secretary of State Mike Pompeo, I Was In The Room
    Too (June 18, 2020) ....................................................................................19

**PRELIMINARY STATEMENT**

Despite this administration's best efforts to blanket its actions in secrecy, critical and damaging details have emerged, and continue to emerge, detailing the efforts of State Department officials, with the knowledge and direct participation of Secretary of State Mike Pompeo, to engage in off-the-books "shadow diplomacy" with foreign leaders and countries perceived by President Trump as able to advance his political and personal interests, and to otherwise keep secret the contents of meetings and discussions with such foreign leaders. Beyond the obvious implications of this conduct for our democracy and the rule of law, it also violates the Federal Records Act ("FRA"). This lawsuit seeks to remedy that violation.

In response to this lawsuit, the State Department and Secretary Pompeo ask the Court to treat this evidence as merely unsubstantiated allegations of a few isolated actions by individuals who have left the State Department and to ignore the alarming policy and practice that it reveals. But Plaintiffs have offered more than enough to cross the Rule 12(b)(6) evidentiary threshold and survive a motion to dismiss. Far from a few, isolated instances of failing to comply with their record creation obligations, the evidence to date reveals that Defendants have knowingly and purposefully participated and continue to participate in diplomatic efforts conducted in secret without the creation of records, which prevents the American people and Congress from learning how this administration has conducted foreign policy, and whether it is consistent with the national interest. Further, the notion that Secretary Pompeo is ignorant of these actions—a premise Defendants ask this Court to accept on faith—is facially and factually erroneous. Secretary Pompeo is not only a close ally of President Trump and part of the "inner circle," but he also is our nation's chief diplomat who has been at President Trump's side at key events and diplomatic exchanges. As this Court recognized in a comparable case, an agency culture of

1

secrecy—expressed here in how Defendants carry out their diplomatic responsibilities—amply supports an FRA claim of failure to create records.

Finally, Defendants' efforts to moot this lawsuit by updating their recordkeeping policies cannot succeed. This lawsuit challenges more than inadequate recordkeeping policies; it challenges Defendants' failure to have effective controls in place that ensure the State Department complies with its obligation to create records of essential transactions. On legal and factual grounds that claim survives a motion to dismiss.

## STATUTORY AND REGULATORY BACKGROUND

### *The FRA and Implementing Regulations*

The FRA mandates that each agency "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed . . . to protect the legal and financial rights of the [g]overnment and of persons directly affected by the agency's activities." 44 U.S.C. § 3101. The statute defines the term "records" very broadly to include:

> all recorded information, regardless of form or characteristics, made or received by a [f]ederal agency under [f]ederal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States [g]overnment or because of the information value of data in them.

44 U.S.C. § 3301 (cross-referenced and applied to Chapter 31 of Title 44 by U.S.C. § 2901(1)).

Regulations promulgated by the Archivist of the United States ("Archivist") describe in detail the obligation the FRA imposes on agencies to create "adequate and proper documentation." Specifically, that obligation requires agencies to prescribe the creation and maintenance of records that:

(a) Document the persons, places, things, or matters dealt with by the agency.

(b) Facilitate action by agency officials and their successors in office.
(c) Make possible a proper scrutiny by Congress or other duly authorized agencies of the [g]overnment.
(d) Protect the financial, legal, and other rights of the [g]overnment and of persons directly affected by the [g]overnment's actions.
(e) Document the formulation and execution of basic policies and decisions and the taking of necessary actions, *including all substantive decisions and commitments reached orally* (person-to-person, by telecommunications, or in conference) or electronically.
(f) Document important board, committee, or staff meetings.

36 C.F.R. § 1222.22 (emphasis added). NARA regulations also mandate that agency

recordkeeping requirements "[i]dentify and prescribe specific categories of records to be

systematically created or received and maintained by agency personnel in the course of their

official duties." 36 C.F.R. § 1222.24(a)(1).

*State Department Guidelines and Regulations*

The State Department's publicly available implementing guidance, 5 FAM [Foreign

Affairs Manual] 422, charges "the Department's Records Officer, representing the head of the

agency" with ensuring that "'[e]ffective controls over the creation and over the maintenance and

use of records in the conduct of current business' are provided." 5 FAM 422(2). Under the

agency's regulations, those controls must ensure that "[i]mportant policies, decisions, and

operations are adequately recorded." 5 FAM 422.1(a)(1). The regulations define adequate

documentation as, among other things, records that are "complete to the extent necessary to . . .

[f]acilitate the making of decisions and policies and the taking of action by the incumbents and

their successors in office" and that "[p]rovide appropriate documentary materials for research

and other historical purposes." 5 FAM 422.2.

State Department regulations delegate to each individual employee the obligation

"[w]ithin his or her area of responsibility" to "create and preserve records that properly and

adequately document the organization, functions, policies, decisions, procedures, and essential transactions of the Department." 5 FAM 422.3.

After Plaintiffs filed their Amended Complaint in this matter on April 17, 2020 (ECF No. 21) challenging in part Defendants' failure to establish and maintain an FRA-compliant recordkeeping program, the State Department amended its guidance on the use of electronic messaging applications. The new guidance generally prohibits State Department employees "from conducting official Department of State business on any eMessaging application that does not allow communications to be archived." 5 FAM 444.2(a). The guidance, however, permits the use of non-official electronic messaging applications to conduct agency business where it "is the only means of communication our partner is willing to use" or "[e]ngagement is greatly enhanced by using such means of communication to carry out the Department's mission." 5 FAM 444.2(b)(1) and (2). In such instances, the guidance requires each agency employee to "ensure that federal records are captured onto official Department systems." 5 FAM 444.2(c).

## FACTUAL BACKGROUND

The impeachment proceedings against President Trump revealed that the president, with the direct knowledge and assistance of Secretary Pompeo and others, including high-level State Department officials, carried out a shadow, off-the-books diplomacy with Ukraine that purposefully bypassed State Department recordkeeping systems and requirements. First Amended Complaint ("Am. Compl.") ¶ 5. According to the whistleblower who filed the complaint with the Office of the Inspector General of the Intelligence Community, President Trump and top State Department officials undertook this shadow diplomacy to pressure Ukrainian President Volodomyr Zelenskyy to take actions that would help President Trump's

2020 reelection bid by announcing Ukraine was initiating an investigation of former Vice President Joe Biden and his son Hunter Biden. *Id.* ¶ 38.

Former Ambassador William Taylor, the U.S. top envoy to Ukraine, testified under oath that the "irregular" or "shadow" diplomatic channel used by then-Ambassador to the European Union Gordon Sondland, former U.S. special envoy to Ukraine Ambassador Kurt Volker, and others was to further a different goal than the "regular" diplomatic channel Ambassador Taylor and other State Department officials were using. *Id.* ¶¶ 42, 44. Although the participants in this irregular channel were "well-connected in Washington," they "operated mostly outside of official State Department channels" in an effort that began after they briefed President Trump upon their return from President Zelenskyy's inauguration. *Id.* ¶ 45.

As an example of how the off-the-books channel worked, Ambassador Taylor described a telephone call with President Zelenskyy that excluded "most of the regular interagency participants" and for which "Ambassador Sondland said that he wanted to make sure no one was transcribing or monitoring." Am. Compl. ¶ 44. Further, as part of this off-the-books diplomacy, State Department officials met separately and privately with former Mayor Rudolph Giuliani, who was guiding the irregular policy channel, to discuss Ukraine. *Id.* ¶¶ 46-47. Participants in the regular diplomatic channel were kept in the dark about President Trump's objectives in Ukraine that Mr. Giuliani and others were carrying out. *Id.* ¶ 47.

Secretary Pompeo for his part played an active and knowing role in this shadow diplomacy. *Id.* ¶ 48. Although he first denied any familiarity with the July 25 phone call between Presidents Trump and Zelenskyy, he eventually admitted he had listened in on the call. *Id.* Beyond that, sworn testimony adduced during the impeachment proceedings revealed Secretary Pompeo—the nation's top diplomat—was "in the loop" on the efforts of Mr. Giuliani and others

to use the off-the-books shadow diplomatic channel to advance President Trump's "scheme regarding Ukraine." *Id.* ¶ 49. Indeed, Mr. Giuliani claimed he only acted at the request of the State Department and "reported every conversation back to them." *Id.*

Ambassador Sondland also corroborated Secretary Pompeo's role in the shadow diplomacy with Ukraine and the fact that the Secretary was "in the loop" on what was happening. Am. Compl. ¶ 50. Not only was Secretary Pompeo aware of what was going on, but his help was enlisted to "'break the logjam' on the security assistance and the White House meeting by coordinating a meeting between the two presidents [Trump and Zelenskyy]." *Id.* ¶ 51. Ambassador Taylor's sworn testimony also confirmed that Secretary Pompeo was aware of the shadow diplomacy being conducted by State Department officials acting in concert with others. Ambassador Taylor described a first-person cable he sent to Secretary Pompeo conveying his "serious concern about the withholding of military assistance to Ukraine while the Ukrainians were defending their country from Russian aggression." *Id.* ¶ 52.

The participants in this shadow diplomacy with Ukraine understood their communications were to be off-the-books. For example, after Ambassador Taylor asked Ambassador Sondland in a WhatsApp message whether a visit by the Ukrainian president to the White House and military assistance were conditioned on the Ukrainians opening investigations, Ambassador Sondland responded, "[c]all me," which kept those details from being memorialized in writing. Am. Compl. ¶ 53. And Ambassador Sondland told Ambassador Taylor directly, in response to Taylor's concerns about conditioning assistance to Ukraine on opening an investigation into the Bidens, to "stop the back and forth by text[.] If you still have concerns I recommend you give [Pompeo] a call to discuss them directly." *Id.* ¶ 54.

Secretary Pompeo's participation in shadow, off-the-books diplomacy was not limited to Ukraine, but extends to diplomatic efforts with other countries as well. For example, Secretary Pompeo met with Russian Foreign Minister Sergey Lavrov on February 14, 2020, in what was intended to be an off-the-books meeting. The State Department made no announcement of the meeting, did not list it on the official schedule of Secretary Pompeo's travel, and omitted any mention of it in a briefing by a senior administration official discussing U.S. efforts at the Munich Security Conference where the meeting took place. Am. Compl. ¶ 55. Further, the U.S. side requested that there be no press conference between the two men or joint statements. *Id.* The meeting only came to light because Russian journalists were informed of the meeting, attended it, and were permitted to write about it afterward. *Id.*

Secretary Pompeo has also engaged in shadow or off-the-books diplomacy with Saudi Arabia. For example, following the murder of journalist Jamal Khashoggi, Secretary Pompeo was present for two calls President Trump made to Saudi King Salman bin Abdulaziz Al-Saud and Crown Prince Mohammed bin Salman. *Id.* ¶ 56. Reportedly no transcripts of those calls were made. *Id.*

The State Department is able to carry out its off-the-books diplomacy in part through the widespread use of WhatsApp, a messaging app that has end-to-end encryption. Am. Compl. ¶ 60. For example, the impeachment proceedings uncovered exchanges between Ambassadors Taylor and Sondland, Zelenskyy aide Audrey Yermak, and Mr. Giuliani using WhatsApp as well as iMessage, another messaging application, as part of their effort to place pressure on Ukraine "to deliver on the President's demand for Ukraine to launch politically motivated investigations." *Id.* The circumstances under which the State Department eventually acquired copies of these messages make clear they were not placed into a State Department recordkeeping system upon or

even shortly after creation. *Id.* ¶ 61. Instead, the agency acquired them from State Department

officials who received congressional subpoenas to produce the records, which those officials

provided directly from their personal phones. *Id.*

While State Department recordkeeping guidance requires employees who send work-

related emails or other electronic communications to copy and archive the messages within

twenty days of their creation or transmission, reportedly "[f]ew, few people do that." Am.

Compl. ¶ 63. This failure is widely known, yet the State Department has not taken effective steps

to stop it. *Id.*

These are just some of the examples of the State Department's policy and practice of

conducting off-the-books diplomacy in a way that evades recordkeeping requirements. Much is

known about the shadow diplomacy conducted with Ukraine because of the extraordinary event

of an impeachment proceeding. The evidence that details the full breadth of Defendants' off-the-

books diplomacy with other countries, however, is uniquely within the possession of the State

Department.

## ARGUMENT

## I.    Standard of Review.

In resolving a Rule 12(b)(6) motion, a court must construe the complaint liberally,

accepting all factual allegations in the complaint as true and drawing all reasonable inferences in

the plaintiff's favor. *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). The court's

review is limited to "the facts alleged in the complaint, any documents either attached to or

incorporated in the complaint and matters of which the court may take judicial notice." *Id.* at

678; s*ee also Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C.

2016) (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

This burden is not intended to be onerous; a count will survive so long as there is a "'reasonably

founded hope that the [discovery] process will reveal relevant evidence' to support the claim."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) (quoting *Dura Pharms., Inc. v. Broudo*,

544 U.S. 336, 347 (2005)).

Under the Federal Rules of Evidence, a court can take judicial notice of "adjudicative

facts," which include facts that "can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). This rule also sweeps in

facts contained in public records of other proceedings, *Abhe & Svoboda, Inc. v. Choa*, 508 F.3d

1052, 1059 (D.C. Cir. 2007); *Covad Commc'ns Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222

(D.C. Cir. 2005), and "historical, political, or statistical facts, or any other fact that are verifiable

with certainty," *Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.2 (D.D.C. 2010).

## II.   Claim One States a Viable, Judicially Reviewable Claim Under the Administrative Procedure Act for Violations by Defendants of Their Mandatory Duties Under the FRA to Create Records.

### A.   Applying Freedom of Information Act Precedent, Plaintiffs Have Properly Alleged a Policy and Practice Claim.

Claim One, brought under the Administrative Procedure Act ("APA"), challenges as

arbitrary, capricious, and contrary to law Defendants' policy and practice of affirmatively

electing not to create and preserve records adequately documenting all organization, functions,

policies, decisions, procedures, and essential transactions of the State Department as the FRA

and implementing regulations require. Am. Compl. ¶¶ 69-75. The Amended Complaint outlines

numerous examples—available to the public at the time of filing—of the off-the-books shadow

diplomacy in which Defendants have engaged in pursuit of President Trump's personal and

political interests to the detriment of any legitimate foreign policy goal. Taken as a whole they

illustrate the challenged policy and practice. This evidence includes:

- The "irregular" or "shadow" diplomatic channel State Department officials used—
  with the knowledge and participation of Secretary Pompeo—reportedly to pressure

Ukraine to open an investigation of Vice President Biden and his son to further the political interests of President Trump, *id.* ¶¶ 42-54;

• The off-the-books diplomacy Secretary Pompeo participated in with Russian Foreign Minister Sergey Lavrov, *id.* ¶ 55;

• The off-the-books calls Secretary Pompeo participated in with Russian President Vladimir Putin, Saudi King Salman bin Abdulaziz Al Saud, and Saudi Crown Prince Mohammed bin Salman, *id.* ¶ 56; and

• The widespread use by State Department officials—with Defendants' knowledge—of encrypted messenger apps, including communications concerning efforts to pressure Ukraine, without placing those messages in agency record keeping systems, *id.* ¶¶ 60-63.

This Court has already provided the appropriate framework for evaluating the merits of this claim: the treatment of policy and practice challenges under the Freedom of Information Act ("FOIA"). *CREW v. Pompeo*, No. 19-3324, 2020 WL 1667638, *5 (D.D.C. Apr. 3, 2020).[1] To sustain a policy and practice claim in the FOIA context a plaintiff must plausibly allege "that the agency has adopted, endorsed, or implemented some policy or practice that constitutes an ongoing failure to abide by the terms of the FOIA." *Id.* (quoting *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 293 (D.D.C. 2013) (internal quotation omitted)). The challenged practice must be "'ongoing'" and "persistent." *CREW v. Pompeo*, 2020 WL 1667638, at *5 (quoting *Scudder v. CIA*, 281 F. Supp. 3d 124, 129 (D.D.C. 2017)). Further, the challenged policy or practice need not be "articulated in regulations or an official statement of policy"; so long as it is more than

---

[1] Defendants mistakenly suggest the "policy or practice" doctrine is rarely applied in the APA context. Ds' Mem. at 24 n.8. To the contrary, as the case they cite makes clear, "'[i]t is well-established that[,] if a plaintiff challenges both a specific agency action and the *policy* that underlies that action'" the policy challenge may survive even if "'the particular agency action is moot.'" *Garcia v. Acosta*, 393 F. Supp. 3d 93, 104 (D.D.C. 2019) (citing *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994)) (emphasis in original). Further, the surviving policy claim may be remedied by "declaratory relief forbidding an agency from imposing a disputed policy in the future." *Garcia*, 393 F. Supp. 3d at 104.

"merely isolated mistakes by agency officials" it presents a legally cognizable claim. *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988).

It is the shift in an agency's non-compliance "from a singular instance" to one that is repeated through a policy or practice that evidences a judicially reviewable claim. *Am. Ctr. for Law & Justice v. United States*, 289 F. Supp. 3d 81, 87 (D.D.C. 2018) (quotations and citations omitted). Further, as the D.C. Circuit has recognized "egregious agency action" is not necessary to state a policy or practice claim. *Judicial Watch, Inc. v. DHS*, 895 F.3d 770, 781 (D.C. Cir. 2018). Rather, in the FOIA context, "an agency may engage in 'some *other* failure to abide by the terms of the FOIA' that could be a basis for finding the agency has an unlawful policy or practice." *Id.* at 781-82 (quoting *Payne*, 837 F.2d at 491) (emphasis in original). That "other failure" could include "an agency's total disregard of the obligations mandated by Congress." *Id.* But, at least in the FOIA context, "the court's prime consideration should be the effect on the public of disclosure or non-disclosure." *Id.* at 783 (quoting *Long v. IRS*, 693 F.2d 907, 909 (9th Cir. 1982) (internal quotation omitted)).

Here, the facts and allegations set forth in the Amended Complaint reveal a pervasive, ongoing, and intentional failure by Defendants to comply with their recordkeeping obligations. Indeed, the evidence suggests they have purposefully avoided creating or having records created of key diplomatic exchanges and communications to prevent the public from learning about this administration's foreign policy actions. Defendants have carried out the State Department's core diplomatic mission in secret, refusing to create or preventing the creation of records documenting their efforts. Their failure to create records represents a "total disregard of the obligations mandated by Congress" in the FRA. *Judicial Watch, Inc. v. DHS*, 895 F.3d at 782.

11

In response, Defendants trot out the same arguments they made with respect to the initial complaint: that Plaintiffs' complaint stems from individual, "compliance-based" claims, Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Ds' Mem.") at 15, 16, that are adequately addressed by the agency's "formal written records policy," *id.* at 17. But unlike the initial complaint, which the Court found involved only "a few isolated actions" by State Department personnel, *CREW v. Pompeo*, 2020 WL 1667638, at *5, the Amended Complaint centers on the conduct of State Department officials, including Secretary Pompeo, who have repeatedly refused to create records of their diplomatic actions and decisions in direct contravention of the FRA. Moreover, Secretary Pompeo was far more than a passive observer; for example, his direct aid was sought to "break the logjam" in furtherance of a quid pro quo scheme with Ukraine. Am. Compl. ¶ 51. Further, not only is Secretary Pompeo the nation's top diplomat, but he also has primary responsibility for records management at the State Department. *See* 44 U.S.C. § 3102. Yet despite his knowledge of the non-compliance by high-level State Department officials with their recordkeeping obligations in the conduct of shadow, off-the-books diplomacy, he has done little if anything to ensure their compliance with the FRA. As a result, Plaintiffs—like the plaintiffs in *Payne* and *Judicial Watch, Inc. v. DHS*—are denied future access to records that Defendants should have created, but intentionally chose not to.

Nor does the existence of an allegedly "FRA-compliant written policy" demonstrate that Plaintiffs' claims are compliance-based as Defendants argue, citing in support *Competitive Enter. Inst. v. EPA*, 67 F. Supp. 3d 23, 32 (D.D.C. 2014) ("*CEI*"). Ds' Mem. at 17. Defendants' interpretation of *CEI* is misleading at best. The key to that court's holding was the fact that the plaintiff was challenging the agency's destruction of text messages as arbitrary and capricious under the APA. *CEI*, 67 F. Supp. 3d at 32. Because the FRA itself circumscribes judicial review

of alleged document destruction by providing "a detailed enforcement scheme," *id.* at 33, the court reasoned that "the substance of [CEI's] allegations constitutes a challenge to EPA's records disposal decisions." *Id.* Accordingly, the court concluded that "private plaintiffs cannot rely on the APA to challenge what they are expressly prohibited from challenging under [the] FRA, i.e., an agency's substantive decisions to destroy or retain records." *Id.* Here, by contrast, Plaintiffs do not seek an end run around the FRA's limited review of document destruction claims. Instead, Plaintiffs raise a completely independent claim that Defendants are not creating records ab initio as the FRA mandates.

In addition, a written policy may not be the only directive issued or understood by an agency's employees. Because there may be "other informal, supplementary guidance" that together with the "FRA-compliant written policy" constitute the total "guidance" give to State Department staff regarding their recordkeeping responsibilities, *Armstrong v. Bush*, 924 F.2d 282, 297 (D.C. Cir. 1991), the sum of Defendants' recordkeeping guidelines and directives may be inadequate, regardless of whether a single written document facially complies with the FRA. As a result, the existence of a written policy does not automatically convert any claim brought under the FRA into a compliance-based claim. Defendants correctly note that *Armstrong d*oes "not allow a plaintiff to proceed with a challenge to an agency's recordkeeping guidance where the guidance on its face complies with statutory requirements *and* there is no evidence of a contrary unwritten recordkeeping policy." Ds' Mem. at 21 (emphasis added).

Here, however, there *is* evidence of such a contrary unwritten recordkeeping policy, as shown in four detailed assertions presented in the Amended Complaint, Am. Compl. ¶¶ 42-59. The Amended Complaint describes: the "irregular" or "shadow" diplomatic channel State Department officials used to reportedly pressure Ukraine to further the political interests of

President Trump; Secretary Pompeo's off-the-books meeting with Russian Foreign Minister Lavrov; and two off-the-books telephone calls Secretary Pompeo participated in with President Putin and members of the Saudi Royal Family. Because of this evidence, Defendants' written policy regarding creation of records does not convert Plaintiffs' policy and practice claim into a compliance-based claim, as Defendants allege. *See* Ds' Mem. at 17-18.

Defendants' arguments impliedly suggest that Plaintiffs can proceed only by identifying a specifically articulated official policy that replaces the Department's written records guidance. *See* Ds' Mem. at 18. But precedent is to the contrary. For example, in *Armstrong*, as mentioned above, the D.C. Circuit recognized that "informal, supplementary guidance," including "additional guidance provided in staff meetings in which recordkeeping responsibilities were discussed," was properly considered in determining the "total 'guidance' given to [agency] staff regarding their recordkeeping responsibilities." 924 F.2d at 297. In *Payne*, the D.C. Circuit explained that in evaluating whether a policy and practice claim was moot, "[t]he fact that the practice at issue is informal, rather than articulated in regulations or an official statement of policy, is irrelevant." 837 F.2d at 491. A challenge to a failure to comply with a statute survives as long as it is not based on "mere[] isolated mistakes by agency officials." *Id.* While presented in the context of mootness, the *Payne* court's reasoning applies equally here, where Plaintiffs are complaining of far more than "isolated mistakes by agency officials," but rather an "impermissible practice" by Defendants of refusing to create records of their essential agency transactions and decisions in violation of the FRA. *Id.*; *see also Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (unwritten policy to disclose confidential information without notice was final agency action for APA purposes because it is a "consummation of the agency's decisionmaking process"). Plaintiffs, having pleaded a policy or practice that continues

to harm them by depriving them of access to important historical documents, need show no more

to state a valid, judicially reviewable policy and practice claim.

>    **B.      Plaintiffs Have Sufficiently Pleaded on Information and Belief to Survive**
>    **Defendants' Motion to Dismiss.**

The Amended Complaint pleads sufficient facts to satisfy Rule 8(a), which only requires

that a complaint contain "a short and plain statement of the claim showing that the pleader is

entitled to relief," because it gives Defendants "fair notice of what that . . . claim is and the

grounds upon which it rests." *Twombly*, 550 U.S. at 555 (holding that Rule 8 requires the

complaint to include facts giving rise to a "plausible," rather than merely "conceivable"

entitlement to relief). Further, to satisfy Rule 8(a), "a complaint does not need detailed factual

allegations." *Baumel v. Syrian Arab Republic*, 667 F. Supp. 2d 39, 43 (D.D.C. 2009) (quoting

*Twombly*, 550 U.S. at 555). Instead, a complaint requires information concerning the

circumstances that give rise to the claims while asking "for more than a sheer possibility that a

defendant acted unlawfully." *Baumel*, 667 F. Supp. 2d at 43 (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (internal quotations omitted)).

Contrary to Defendants' assertions, D's Mem. at 21-25, factual allegations based on

"information and belief" are sufficient to raise a policy and practice claim. The plausibility

standard "does not prevent a plaintiff from pleading facts alleged upon information and belief

where the facts are peculiarly within the possession and control of the defendant, *or* where the

belief is based on factual information that makes the inference of culpability plausible."

*Evangelou v. Dist. of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C 2012) (internal quotations

omitted and emphasis added); *accord. Bancroft Glob. Dev. v. United States*, 330 F. Supp. 3d 82

(D.D.C. 2018). Here, both conditions are met: (1) facts regarding Defendants' compliance with

the FRA are uniquely within their control; and (2) even the limited information currently in the public sphere makes the inference of culpability plausible.

First, evidence of additional recordkeeping failures—currently unknown to the public—is squarely in the hands of Defendants. In such a situation, Plaintiffs cannot be expected to have personal knowledge of the relevant facts. As such, "[p]leading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1224 (3d ed. 2004). This principal recognizes the disadvantage that plaintiffs face in situations in which defendants control access to necessary information and is akin to other inferences or standards that may apply in such cases. For example, the "missing witness" rule allows one party to obtain an adverse inference against the other party for the failure to produce a witness with material information when the witness is under the other party's control. *See Graves v. United States*, 150 U.S. 118 (1893); *see also Bufco Corp. v. NLRB*, 147 F.3d 964 (D.C. Cir. 1998). Likewise, here, without intrepid journalism or congressional investigations, Defendants control all access to additional facts regarding the administration's recordkeeping failures. As a result, the Amended Complaint's factual allegations based on information and belief are "sufficient to survive a motion to dismiss." *Bancroft*, 330 F. Supp. 3d at 102.

Second, the factual allegations in the Amended Complaint asserted on information and belief are based on publically available information that makes Defendants' culpability plausible. Specifically, Defendants used an "irregular" or "shadow" diplomatic channel to reportedly pressure Ukraine to further the political interests of President Trump; Secretary Pompeo held an off-the-books meeting with Russian Foreign Minister Lavrov; and Secretary Pompeo participated

in two off-the-books telephone calls with President Putin and members of the Saudi Royal Family. These facts support a claim that Defendants have affirmatively elected not to create records memorializing Defendants' interactions with certain foreign leaders. By its nature, an "unwritten" policy—one that impermissibly conflicts with the official written policy—can be proven by, among other things, showing specific incidents that are in conflict with the written policy. While Defendants characterize such incidents in the Amended Complaint as "tangentially-related snippets of alleged information in news reports," Ds' Mem. at 23, these incidents are the result of such a policy. That some of the information to support the factual allegations in the Amended Complaint come from news reports is irrelevant. At this point in the proceedings, under Rule 12(b), the Court is required to accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Hurd*, 864 F.3d at 678. Finally, allowing Plaintiffs' case to proceed and permitting factual development is not a fishing expedition, as Defendants argue, Ds' Mem. at 23, because the specific allegations in the complaint support a basis for a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim." *Twombly*, 550 U.S. at 563 n.8 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

### C.   The Limited Publicly Available Factual Record Adequately Supports Plaintiffs' Policy and Practice Claim.

Having failed to demonstrate the pleading insufficiency of Claim One, Defendants attack the veracity of the facts on which it is based and attempt to recast them as stating a "theory" based on mere allegations. Ds' Mem. at 18-19. Such arguments, however, are appropriately presented at the summary judgment stage, not in a motion to dismiss where the Court must accept the facts as true. Moreover, the existence of "shadow diplomacy" is not simply an

allegation as Defendants argue, *see, e.g.*, *id.* at 18, but is a matter of fact attested to by multiple witnesses under oath during the impeachment proceedings. *See* Am. Compl. ¶¶ 44-54.

Defendants also stretch to contort the facts here into the fact pattern in *CREW v. Wheeler*, where this Court concluded that because the gravamen of the plaintiffs' complaint focused almost exclusively on then-EPA Administrator Scott Pruitt, CREW's claims had no continuing vitality after he left the agency. 352 F. Supp. 3d 1, 9-10 (D.D.C. 2019). Here, Defendants focus on the fact that three of the State Department officials involved in off-the-books diplomacy with Ukraine no longer work in the State Department (a consequence of their testifying during the impeachment proceedings), arguing this undermines Plaintiffs' policy and practice claim. Ds' Mem. at 18. But Defendants ignore the fact that those individuals were operating in coordination with Secretary Pompeo, who has continued to engage in off-the-books diplomacy after their departure with the continuing assistance of other State Department officials, and who has done nothing to correct the recordkeeping failures their actions disclosed. *See* Am. Compl. ¶¶ 55-57. Defendants also argue that the president and Mr. Giuliani, not any State Department officials, led the shadow diplomacy conducted with Ukraine. Ds' Mem. at 18. This ignores several key facts, including Mr. Giuliani's claim that "he did not talk to a Ukrainian official 'until the State Department called [him] and asked [him] to do it,' after which he 'reported every conversation back to them.'" Am. Compl. ¶ 49. It is Mr. Giuliani, not the Plaintiffs, who placed the State Department and its leadership at the center of the Ukraine quid pro quo scheme.

Defendants essentially ask this Court to ignore the pattern of conduct in which Secretary Pompeo and the State Department have engaged and consider the facts divorced from their larger context. This is not a case of "certain Department officials" allegedly acting "outside regular Department channels." Ds' Mem. at 21. Rather, the core of Plaintiffs' claims is that Secretary

Pompeo and the State Department replaced the regular diplomatic channel with a shadow, off-the-books channel in conducting foreign policy with certain of our adversaries and other foreign governments to evade the requirements of the FRA. Defendants' conduct with respect to Ukraine has been repeated in Secretary Pompeo's dealings with Russia and Saudi Arabia, and his more general tolerance and dismissal of agency-wide non-compliance with recordkeeping requirements, expressed through the known widespread use of encrypted messaging apps without preserving the messages sent or received using those apps. These actions share a common theme: no records are created memorializing what was discussed with, requested of, requested by, or agreed to with foreign governments.

Moreover, it is no small matter that with Ukraine, the Secretary of State was briefed on efforts to conduct shadow diplomacy by high-level State Department officials, acting in concert with President Trump's personal lawyer (who himself claims he was acting with the full knowledge of the State Department). While Defendants make light of this "nefarious activity," Ds' Mem. at 18, it strikes at the core of our democracy and the rule of law.

New factual allegations that may support Plaintiffs' policy and practice claim, but were not laid out in the Amended Complaint as they were unknown at the time of filing, continue to be made public. Most recently, for example, John Bolton, President Trump's former national security advisor, alleged that the president "personally and explicitly asked his Chinese counterpart, Xi Jinping, to help him stay in power by increasing purchases of U.S. agricultural goods." Ana Swanson and Alan Rappeport, *Trump's Trade Appeals to China Still Left Farmers Reeling*, N.Y. Times, June 19, 2020, https://tinyurl.com/ydhshnux. While Mr. Bolton does not provide a complete list of all those present when these overtures were made, Secretary Pompeo's response to Mr. Bolton's book may be telling. In advance of the book's release, Secretary

Pompeo issued a press statement entitled "I Was In The Room Too." Press Statement, Secretary

of State Mike Pompeo, I Was In The Room Too (June 18, 2020), https://tinyurl.com/yb3f3slf.

These alleged requests of China may further expose the off-the-books shadow diplomacy in

which Plaintiffs allege Defendants have engaged at the service of the president's personal and

political interests in violation of the FRA.

### D.    Judicial Review of Plaintiffs' Policy and Practice Claim Accords Fully with the Armstrong Decisions and the APA.

Starting with *CREW v. Pruitt*, the government has sought to advance an interpretation of

the FRA that would preclude judicial review of any records creation claim. Despite this Court's

rejection of this interpretation, Defendants once again argue that under the *Armstrong* precedent,

judicial review of records creation claims is foreclosed because there are no judicially

manageable standards to apply. Once again, Defendants are wrong.

First, after considering the government's arguments this Court concluded in *CREW v.

Pruitt*, 319 F. Supp. 3d 252 (D.D.C. 2018), that nothing in the D.C. Circuit's *Armstrong*

decisions foreclose judicial review of challenges to an agency's failure to create records. The

Court reasoned that "[a]llowing judicial review of the agency's failure to create such documents

[concerning agency policies and decisions] 'will frustrate neither the intent of Congress nor the

FRA statutory scheme designed to implement that intent.'" *Id.* at 260 (quoting *Armstrong v.

Bush*, 924 F.2d 282, 293 (D.C. Cir. 1991)). Moreover, recognizing judicial review of the kind of

claim Plaintiffs have brought here accords fully with the presumptions underlying the APA's

review provisions "(1) that 'Congress does not intend administrative agencies, agents of

Congress'[s] own creation, to ignore clear . . . regulatory [or] statutory . . . commands,' and (2)

that in favor of judicial review." *Pruitt*, 319 F. Supp. 3d at 258 (quoting *Heckler v. Chaney*, 470

U.S. 821, 839 (1985) (citation omitted)). Simply stated, Defendants have ignored and flouted the

clear statutory command in the FRA to create records of their essential transactions and decisions; judicial review ensures those records violations will be redressed.

Certainly, this Court's ruling in *CREW v. Pruitt* is not without limitations. In response to the government's fear that judicial review would raise "a flood of future suits challenging every purported FRA violation," the Court cautioned that future plaintiffs may challenge only an agency's actions "in the aggregate, of refusing to create certain records, they may not demand judicial review of isolated acts." *Pruitt*, 319 F. Supp. 3d at 260. It is this distinction that Defendants seek to exploit here, characterizing Plaintiffs' claims as mere "deficiencies in compliance" for which judicial review would "'inject[] the judge into day-to-day agency management' by empowering him 'to decide just how much detail is necessary,' in any given instance to satisfy the adequate documentation requirement." Ds' Mem. at 17 (quoting *CREW v. DHS*, 387 F. Supp. 3d 33, 51 (D.D.C. 2019)). But this misapprehends the nature of Plaintiffs' claims. Plaintiffs are not complaining about the *adequacy* of records Defendants have created, but rather their failure to create records at all. To redress this claim the Court need not inject itself into the day-to-day management of the State Department's records practices. To the contrary, as the relief Plaintiffs have requested here illustrates, the Court need only issue

> a declaration that Defendants are in violation of their statutory duties under 44 U.S.C. §§ 3101, 3301 and implementing NARA regulations, 36 C.F.R. § 1222.22, and an order compelling them to make and preserve as federal records all records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the State Department.

Am. Compl. ¶ 75 and Prayer for Relief. Such an order leaves Defendants with the discretion to determine what is adequate and proper documentation of any particular function, policy, or decision, but prevents them from ignoring entirely their obligation to create records in the first place.

Second, Defendants offer nothing new that should alter the Court's conclusion on the viability of a records creation claim. They accurately point out that *Armstrong* did not expressly endorse a records creation claim, Ds' Mem. at 25, but this is a far cry from the conclusion that such a claim is precluded. They cite to the FRA's legislative history to support their suggestion that judicial review here would conflict with Congress's goal of relieving agencies of the burden of "creating too many unnecessary records." *Id.* at 26. But whatever the merits of that general proposition with respect to "unnecessary records," it surely has no application here where the record creation failures pertain to the performance of Defendants' core statutory responsibilities.

Third, Defendants' claim that "[w]hen it comes to the FRA's adequate documentation requirement, the FRA provides no judicially manageable standards," Ds' Mem. at 27, falls wide of the mark. To repeat, Plaintiffs are challenging Defendants' policy and practice of affirmatively failing to create records ab initio, not their failure to create *adequate* records. To resolve the claim Plaintiffs have actually brought, the Court will not have to decide the level of detail required of every document to comply with the FRA. Rather, applying standards spelled out explicitly in the FRA the Court will need to decide only whether the State Department has an unofficial policy and practice of affirmatively refraining from documenting the "organization, functions, policies, decisions, procedures, and essential transactions of the agency." 44 U.S.C. § 3101.

As support for their argument that the Court lacks judicially manageable standards, Defendants point to the decision of the district court in *CREW v. DHS*, 387 F. Supp. 3d 33 (D.D.C. 2019). There, the plaintiffs challenged as contrary to the FRA the failure of DHS to create records linking migrant children to adult companions from whom they were separated at the border. The court characterized this claim as "not challeng[ing] a DHS policy, official or

22

unofficial, setting agency-wide compliance with the FRA," but rather "DHS's deficient compliance with § 3101 with regards to some of the records the agency creates." *DHS*, 387 F. Supp. 3d at 53. Based on this characterization of the records claim before it, the court dismissed the claim as not subject to judicial review. *Id.* Here, by contrast, Plaintiffs are challenging an unofficial State Department policy and practice of affirmatively electing not to create records of essential agency transactions and communications. As such, it falls outside the type of compliance-based claim for which the court in *CREW v. DHS* concluded judicial review is unavailing.

Beyond this critical difference, the court in *CREW v. DHS* gave a very narrow cast to this Court's rulings in *Pruitt* and *Wheeler*, characterizing them as extending the reasoning of *Armstrong* "in one narrow respect . . . to allow review not just of an agency's formal recordkeeping guidelines but also of an agency's unofficial, *de facto* policy of refusing to create records." 387 F. Supp. 3d at 53. But this Court in *Pruitt* cast a wider net by limiting the preclusion of judicial review recognized in *Armstrong* to the FRA's "provision governing destruction of records," but not "reach[ing] more broadly into records *creation* under § 3101 as well." 319 F. Supp. 3d at 258 (emphasis in original). In fact, the Court reasoned, "*Armstrong* implies that such claims are appropriate for judicial review" because such review "'will frustrate neither the intent of Congress nor the FRA statutory scheme designed to implement that intent.'" *Id.* at 260 (quoting *Armstrong*, 924 F.2d at 293).

Subsequently in *Wheeler*, this Court did not retreat from this position, but dismissed the records creation claim on the entirely independent basis that, as a factual matter, the plaintiffs' grievances were with Mr. Pruitt who no longer served as the EPA administrator. 352 F. Supp. 3d at 9. As the Court concluded, "[w]ith his departure, there is little alleged in Count I left to

remedy," *id.* at 10, given that "[p]laintiffs do not lodge a grievance against the conduct of any other member of EPA." *Id.* at 9. Here, unlike *Wheeler*, Plaintiffs' claims are not dependent on the actions of any particular State Department official. Plaintiffs instead allege that the challenged unlawful policy and practice of concealing the existence and contents of the president's one-on-one meetings with foreign leaders was in service of President Trump, not the State Department. Thus, unlike in *Wheeler*, the challenged informal policy "would or does continue to exist independent of" any particular individual. *Id.* at 10.

This Court also opined that CREW in any case would not be entitled to an injunction essentially requiring the EPA to comply with the FRA. *Id.* But that conclusion flowed from the fact that in the case before it, the EPA had newly developed and implemented a policy that was no longer deficient under the FRA. The instant case presents no comparable facts; as alleged in the Amended Complaint, Defendants continue to engage in off-the-books diplomacy.

If this case were truly about a disagreement over the adequacy of a particular document, or an isolated failure to create records, Defendants' arguments might have more force. But the reality is far different. As alleged in the Amended Complaint, Defendants have knowingly and purposely elected not to create records as the FRA requires in circumstances that suggest they are doing so to hide their role in advancing the political and personal interests of the president. Absent the check that judicial review by this Court will bring, it is likely that Defendants will continue to flout the requirements of the FRA, leaving Plaintiffs, Congress, and the public with a seriously deficient historical record.

## III.   Claim Two States a Justiciable, Plausible, and Live Challenge to the Adequacy of Defendants' Records Management Program and Controls.

Plaintiffs' Amended Complaint also states a plausible APA claim that the State Department has unlawfully failed to establish and maintain an adequate program to preserve

24

federal records, in violation of the FRA, 44 U.S.C. §§ 3102, 3105, and associated NARA regulations, 36 C.F.R. §§ 1220.32, 1220.34. Am. Compl. ¶¶ 76-81. Claim Two reaches beyond the written guidance, which the State Department updated during the pendency of this litigation, and seeks to enforce a core, well-defined responsibility that the FRA requires agency heads to "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency." 44 U.S.C. § 3102; *see also* Am. Compl. ¶ 77.

Contrary to Defendants' misleading characterizations, the decisions in *Judicial Watch, Inc. v. FBI* and *Pruitt* uphold the justiciability of challenges to the adequacy of an agency's records management program and controls. Because the Amended Complaint now incorporates allegations that senior State Department officials, including Secretary Pompeo, have knowingly participated in or sanctioned policies and practices that flout the FRA, the State Department's guidance, training, and evaluation—in other words its records management *program* and *controls*—fall short of what the FRA requires. For this reason, Claim Two states a plausible claim under the APA and should not be dismissed.

Defendants mischaracterize the *Judicial Watch* decision as "reject[ing] the notion that 'systemic noncompliance' alone was sufficient to state a plausible claim of a defective recordkeeping policy under *Armstrong*." Ds' Mem. at 32 (citing *Judicial Watch, Inc. v. FBI,* No. 18-2316, 2019 WL 4194501, at *6 (D.D.C. Sept. 4, 2019)). The opinion says no such thing. Rather, in the process of rejecting the same argument that Defendants assert here, the court endorsed a distinction between a claim that raises only the "systemic noncompliance" of agency employees with agency recordkeeping and one that "challenges Defendants' *failure to provide effective controls over the maintenance of electronic messages, excluding emails*." *Judicial Watch, Inc. v. FBI*, 2019 WL 4194501, at *6 (emphasis added).

That distinction matters because here, as in *Judicial Watch*, the Court faces two distinct questions: First, is the claim justiciable under the APA and *Armstrong*? Second, does the Amended Complaint contain factual allegations that plausibly establish that claim for relief? The answer to both questions is yes.

Claim Two states a justiciable claim for relief because it challenges Defendants' recordkeeping program or controls, not just their written policies. This presents precisely the kind of claim that this Court endorsed in both *Judicial Watch* and *Pruitt*.[2] In *Judicial Watch v. FBI*, this Court held that a challenge to agency recordkeeping programs and controls was justiciable under *Armstrong*. 2019 WL 4194501, at *6. And in *CREW v. Pruitt*, this Court held that "Plaintiffs' allegation that [an agency's recordkeeping] program is insufficient under the FRA . . . is a plausible claim upon which this Court can grant relief," and denied the government's first motion to dismiss. 319 F. Supp. 3d at 261.

Claim Two plainly seeks to enforce Defendants' obligations under the FRA to "establish and maintain a records management program that provides for effective controls over the agency's records," and to "establish safeguards against the removal or loss of records the agency head determines to be necessary and required by regulations the Archivist promulgates." Am. Compl. ¶ 77 (citing 44 U.S.C. §§ 3102, 3105). To vindicate this claim, Plaintiffs seek, among other things, an order "compelling Secretary Pompeo and the State Department to maintain a

---

[2] As this Court explained in dismissing the initial complaint, "*Armstrong* and *Pruitt* clarify that a Court can review an APA claim challenging an agency's informal policy or practice of violating certain directives of the FRA, including the Act's records-creation and -destruction mandates, but it cannot address individual acts of noncompliance." *CREW v. Pompeo*, 2020 WL 1667638, at *4. Under *Armstrong*, "courts may 'review the adequacy of an agency's guidelines and directives' governing records destruction and retention." *Id.* (quoting *Armstrong*, 924 F.2d at 293-94). This is the law of the case, and there is no need for the Court to revisit this issue.

program to adequately document the State Department's organization, functions, policies, decisions, procedures, and essential transactions." Am. Compl., Prayer for Relief.

Nor is a claim challenging an agency's failure to establish adequate records management programs and controls limited to the four corners of formal agency guidance. Indeed, this Court has also held that an agency's informal policies and practices can be challenged provided the plaintiff is alleging widespread noncompliance with the FRA. For instance, in *CREW v. Pruitt*, the Court sustained a claim challenging an agency's policy and practice of violating the FRA's record-creation provision. 319 F. Supp. 3d at 260. As the Court has already stated in this case, challenged policies and practices "may be 'informal, rather than articulated in regulations or an official statement of policy.'" *CREW v. Pompeo*, 2020 WL 1667638, at *4 (quoting *Khine v. DHS*, 334 F. Supp. 3d 324, 332 (D.D.C. 2018), *aff'd*, 943 F.3d 959 (D.C. Cir. 2019)).

The Court must ground its analysis of the sufficiency of Plaintiffs' factual allegations in the theory of harm advanced in Claim Two. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Plaintiffs' allegations of widespread, intentional, and systematic deficiencies with Defendants' recordkeeping in conjunction with an "irregular," "informal," and "off-the-books" effort involving the most senior State Department officials provide the backstop to Plaintiffs' claim that the State Department's records management program and controls are deficient. Am. Compl. ¶¶ 45-56. In other words, many of the systemic deficiencies Plaintiffs allege are the symptoms, not the substance, of the legal violation that Plaintiffs plead in Claim Two.

This is not to understate the severity of those symptoms. The Amended Complaint incorporates new factual allegations that provide evidence of serious deficiencies in the agency's records management controls. These include the allegation that Secretary Pompeo, the individual ultimately responsible for establishing and maintaining State's records management program, 44 U.S.C. § 3102, and the individual vested with statutory power to supervise and direct the administration of the State Department, 22 U.S.C. § 2651a, tacitly or explicitly sanctioned the "shadow diplomacy" orchestrated by Ambassador Sondland and Mr. Giuliani aimed at getting Ukraine to investigate President Trump's presumptive general election rival, Joe Biden.[3] *See*, *e.g.*, Am. Compl. ¶¶ 51-52 (recounting sworn testimony from two State Department officials demonstrating Secretary Pompeo's knowledge of the shadow diplomacy).

As part of this shadow diplomacy, senior State Department officials, including Ambassador Sondland and Ambassador Taylor, communicated using WhatsApp rather than agency email. Ambassador Sondland repeatedly attempted to move those conversations off the record, including by suggesting that Ambassador Taylor call Secretary Pompeo to discuss concerns with him directly. Am. Compl. ¶ 54. The Amended Complaint also details allegations regarding efforts by Secretary Pompeo not to create records of a February 2020 meeting with Russian Foreign Minister Lavrov during the Munich Security Conference. Am. Compl. ¶ 55. The Amended Complaint further alleges that Secretary Pompeo failed to create records of calls with both Russian President Putin and members of the Saudi Royal Family. Am. Compl. ¶ 56.

---

[3] The fact that Secretary Pompeo continues to serve as the head of the agency and shape both formal and informal recordkeeping policy at the State Department distinguishes this case from *CREW v. Wheeler*. In *Wheeler*, the Court dismissed plaintiff's claims as moot after the agency revised its recordkeeping policies and Secretary Pruitt had resigned. 352 F. Supp. 3d at 9 ("Pruitt's embattled tenure at EPA, however, has come to an end, as he resigned on July 6, 2018. Whatever policies are now in place at the Agency, they no longer exist 'at his direction.'").

These and other factual allegations contained in the Amended Complaint reflect serious deficiencies in Defendants' record management program. For instance, the FRA provides that the program "shall provide for: (1) effective controls over the creation and over the maintenance and use of records in the conduct of current business; . . . and (4) compliance with sections 2101-2117, 2501-2507, 2901-2909, and 3101-3107, of this title and the regulations issued under them." 44 U.S.C. § 3102. Among the responsibilities cross-referenced in 44 U.S.C. § 3102 are the goals of records management standards laid out in 44 U.S.C. § 2902, which include "[a]ccurate and complete documentation of the policies and transactions of the [f]ederal [g]overnment"; "[c]ontrol of the quantity and quality of records produced by the [f]ederal [g]overnment"; and "[j]udicious preservation and disposal of records."

The Amended Complaint details shadow, off-the-books efforts that included two State Department ambassadors acting with the knowledge of Secretary Pompeo. Am. Compl. ¶¶ 5, 46, 54-56. The Amended Complaint also details testimony from several of those involved about conscious efforts to avoid creating records of the work they were conducting. *See, e.g.*, Am. Compl. ¶ 44 ("'Ambassador Sondland said that he wanted to make sure no one was transcribing or monitoring as they added President Zelenskyy to the call.'"); *id.*, ¶ 47 ("Moreover, participants in the regular diplomatic channel were kept in the dark about the [p]resident's objectives in Ukraine."). The existence of an intentional effort to conduct U.S. foreign policy in this manner is sufficient to substantiate a claim that the State Department under Secretary Pompeo does not have a lawful records management program or controls.

At this stage, Plaintiffs merely need to state a plausible claim for relief supported by non-conclusory allegations. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."). Plaintiffs' factual allegations are not legal conclusions; rather, in many cases, they are sworn statements and documentary evidence drawn from congressional proceedings. The Court must assume the veracity of those allegations and determine whether they give rise to an entitlement to relief. *Id.* at 679.

Here, the factual allegations give rise to a plausible claim that Defendants' records management program falls short of the specific requirements laid out in NARA regulations. Plaintiffs' allegations lead to a plausible inference that the State Department does not have a "comprehensive records management program," 36 C.F.R. § 1220.32, because its policies and procedures do not ensure that:

> (a) Records documenting agency business are created or captured;
> (b) Records are organized and maintained to facilitate their use and ensure integrity throughout their authorized retention periods;
> (c) Records are available when needed, where needed, and in a usable format to conduct agency business;
> (d) Legal and regulatory requirements, relevant standards, and agency policies are followed;
> (e) Records, regardless of format, are protected in a safe and secure environment and removal or destruction is carried out only as authorized in records schedules; and
> (f) Continuity of operations is supported by a vital records program (see part 1223 of this subchapter).

36 C.F.R. § 1220.32.

To be sure, additional facts in the sole possession of the State Department would likely help Plaintiffs further elucidate the precise inadequacies in Defendants' records management program and controls. In discovery, Plaintiffs would seek not only to substantiate those claims, but also to establish a predicate for relief, including what specific remedial actions this Court might compel the Department of State to address. Specifically, Plaintiffs would seek to ensure that the specific requirements NARA established for an agency records management program are followed, including mandates that an agency:

(f) Provide guidance and training to all agency personnel on their records
management responsibilities, including identification of [f]ederal records, in all
formats and media;
. . .
(i) Institute controls ensuring that all records, regardless of format or medium, are
properly organized, classified or indexed, and described, and made available for
use by all appropriate agency staff; and
(j) Conduct formal evaluations to measure the effectiveness of records
management programs and practices, and to ensure that they comply with NARA
regulations in this subchapter.

36 C.F.R. § 1220.34.

For these reasons, the Court should also reject Defendants' half-hearted suggestion that

Claim Two is moot. *See* Ds' Mem. at 29. The State Department's late and opportunistic revisions

to the FAM, the agency's formal recordkeeping policy, do not moot the components of

Plaintiffs' claim challenging deficiencies in Defendants' records management program and

controls. *See Powell v. McCormack*, 395 U.S. 486, 497 (1969) ("Where one of the several issues

presented becomes moot, the remaining live issues supply the constitutional requirement of a

case or controversy."). Because Plaintiffs continue to pursue a claim that could result in this

Court granting Plaintiffs relief beyond the action State has voluntarily taken, Claim Two is not

moot. *Cody v. Cox*, 509 F.3d 606, 608 (D.C. Cir. 2007) ("For a case to become moot, it must be

'impossible for the court to grant 'any effectual relief whatever.'") (quoting *Church of*

*Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992)).

Accordingly, Defendants' motion to dismiss should also be denied with respect to Claim

Two.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

BAKER & MCKENZIE LLP

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON

*/s/* George M. Clarke III
George M. Clarke III, D.C. Bar No. 480073
Mireille R. Oldak, D.C. Bar No. 1027998
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 835-6184
Fax: (202) 416-7184
george.clarke@bakermckenzie.com
mireille.oldak@bakermckenzie.com

*/s/* Anne L. Weismann
Anne L. Weismann, D.C. Bar No. 298190
Conor M. Shaw, D.C. Bar No. 1032074
1101 K Street, N.W., Suite 201
Washington, D.C. 20005
Phone: (202) 408-5565
aweismann@citizensforethics.org
cshaw@citizensforethics.org

*Counsel for Plaintiffs*

Dated: July 15, 2020