**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL R. POMPEO *et al*., <br><br> Defendants. | No. 1:19-cv-3324 JEB |

**<u>DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................. iii

INTRODUCTION ...................................................................1

ARGUMENT ........................................................................2

    I.    CLAIM ONE IS NOT VIABLE UNDER THE APA OR
          *ARMSTRONG* ............................................................2

          A.    Plaintiffs Concede That the Department's Written Guidance—
               Which They Do Not Challenge—Complies With the FRA, and
               They Identify No Alternative Final Agency Action ......................4

          B.    Plaintiffs' Factual Assertions Do Not Describe a Recordkeeping
               Policy or Practice and Instead Demonstrate That Claim One Is
               Compliance-Based .........................................................7

          C.    Plaintiffs' Requested Relief Is Identical to That Deemed
               Inappropriate in *Wheeler* and Reflects a Broad Programmatic
               Challenge to Which No Judicially Manageable Standards
               Apply ....................................................................15

    II.    CLAIM TWO SHOULD ALSO BE DISMISSED...................................18

CONCLUSION .......................................................................23

## **TABLE OF AUTHORITIES**

### **Cases**

*Armstrong v. Bush ("Armstrong I"), 924 F.2d 282 (D.C. Cir. 1991) .................... passim

*Armstrong v. Exec. Office of the President ("Armstrong II"),
    1 F.3d 1274 (D.C. Cir. 1993) ................................................................12

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ......................................................13, 15

Bancroft Global Dev. v. United States, 330 F. Supp. 3d 82 (D.D.C. 2018) ....................14

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ........................................13, 15

*Competitive Enter. Inst. v. U.S. Envt'l. Prot. Agency ("CEI"),
    67 F. Supp. 3d 23 (D.D.C. 2014) ........................................................4, 5

*CREW v. DHS, 387 F. Supp. 3d 33 (D.D.C. 2019) ............................3, 17, 18, 20, 21, 22

*CREW v. Pruitt, 319 F. Supp. 3d 252 (D.D.C. 2018) ................................2, 3, 8, 20, 21

*CREW v. Pompeo ("Pompeo I"),
    No. 19-3324, 2020 WL 1667638 (D.D.C. Apr. 3, 2020) ........................... passim

CREW v. Trump, 438 F. Supp. 3d 54 (D.D.C. 2020),
    appeal pending, No. 20-5037 (D.C. Cir.). ........................................................13

*CREW v. Wheeler, 352 F. Supp. 3d 1 (D.D.C. 2019) ....................................4, 15, 16, 22

Democracy Forward Found. v. Pompeo,
    No. 19-1773, 2020 WL 4219817 (D.D.C. July 23, 2020) ....................................18

Evangelou v. Dist. of Columbia, 901 F. Supp. 2d 159 (D.D.C. 2012) ............................14

Garcia v. Acosta, 393 F. Supp. 3d 93 (D.D.C. 2019) ........................................................5

Hispanic Affairs Project v. Acosta, 901 F.3d 378 (D.C. Cir. 2018) ..................................8

*Judicial Watch, Inc. v. FBI,
    No. 18-2316, 2019 WL 4194501 (D.D.C. Sept. 4, 2019) ....................3, 19, 20, 21

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990) ....................................................3, 22

*Norton v. SUWA, 542 U.S. 55 (2004) ................................................................3, 18, 22

*Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ................................5

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) ...................12

*Sai v. TSA*, 326 F.R.D. 31 (D.D.C. 2018) ...................................................................7, 20

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ..................................12

*Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) ............................6

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186 (4th Cir. 2013) ...2

*Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*,
     268 F. Supp. 3d 61 (D.D.C. 2017) ......................................................................20

*Zivotofsky ex rel. Zivotofsy v. Kerry*, 135 S. Ct. 2076 (2015) ..........................................12

## Statutes

5 U.S.C. § 551 ....................................................................................................................2

5 U.S.C. § 701 ....................................................................................................................2

5 U.S.C. § 704 ....................................................................................................................2

Federal Records Act ("FRA"),
     44 U.S.C. Chapters 21, 29, 31, and 33......................................................... *passim*

Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209 ...........................12

44 U.S.C. § 3101 ........................................................................................................17, 18

44 U.S.C. § 3102 ........................................................................................................19, 21

44 U.S.C. § 3105 ..............................................................................................................19

44 U.S.C. § 3106 .........................................................................................................3, 4-5

## Regulations

36 C.F.R. § 1222.32 .........................................................................................................19

36 C.F.R. § 1222.34 .........................................................................................................19

## INTRODUCTION

Plaintiffs' second attempt to make their assertions of "shadow" and "off-the-books" diplomacy into cognizable Administrative Procedure Act ("APA") claims against defendants the U.S. Department of State (the "Department") and Secretary of State Michael R. Pompeo (the "Secretary") (collectively, "Defendants") fails for the same reasons as their first. Although Plaintiffs ostensibly allege violations of the Federal Records Act ("FRA"), they rely on assertions that have little or nothing to do with the Department's compliance with internal recordkeeping requirements and that continue to be incompatible with the longstanding limitations on judicial review of alleged FRA violations, as recognized by the D.C. Circuit in *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991). Despite an expanded set of allegations, now not only in connection with Ukraine but encompassing a number of random meetings and telephone calls that the Secretary attended or listened to, Plaintiffs continue to identify "*one* phone call," *CREW v. Pompeo* ("*Pompeo I*"), No. 19-3324, 2020 WL 1667638 (D.D.C. Apr. 3, 2020), as the only link between the alleged nefarious activities that they highlight and their recordkeeping claims. Particularly given that the three Department employees described have left the Department, their factual assertions identify no more than, at most, limited instances of individual former employees' noncompliance with the FRA, which this Court has already recognized do not set forth a cognizable claim.

Plaintiffs' opposition brief, while insisting that their claims go beyond isolated acts of noncompliance, tips them over to the other extreme, emphasizing the breadth of their claims. Indeed, now that the Department's revision to its official recordkeeping policy has mooted any challenge to its guidance on the preservation of records created or received through electronic messaging applications, Plaintiffs attempt to revamp their second claim into a mirror image of

their first. But their broad, though incoherent, programmatic attacks are just as problematic under the APA. Neither of Plaintiffs' claims identify a discrete "policy or practice"—even an unwritten one—that could be challenged under the APA as a "final agency action," and their requested relief would impermissibly involve the Court in ongoing oversight to determine what qualifies as "adequate" in any given circumstance. Both of Plaintiffs' claims should again be dismissed.

## ARGUMENT

### I.   CLAIM ONE IS NOT VIABLE UNDER THE APA OR *ARMSTRONG*

As discussed in Defendants' opening brief, Claim One, which broadly asserts a "policy and practice" of "affirmatively electing not to create and preserve records adequately documenting the organization, functions, policies, decisions, procedures, and essential transactions of the State Department," Am. Compl. ¶ 71, fails to state a viable claim of FRA violation under the APA or the D.C. Circuit's seminal decision in *Armstrong I* on the justiciability of claims asserting FRA violations. As this Court has recognized, "[t]he APA only permits challenges to 'final agency action,'" and FRA-based claims are no exception to this well-established limitation. *See CREW v. Pruitt*, 319 F. Supp. 3d 252, 260 (D.D.C. 2018) (quoting 5 U.S.C. § 704). Indeed, in *Pruitt*, this Court expressly invoked the "final agency action" limitation as a safeguard against "a flood of future suits challenging every purported FRA violation." *Id.*

*Armstrong* and subsequent decisions of this Court and other courts in the District provide guidance about what a "final agency action" is, and is not, in the FRA context. "[A]gency action" does not encompass everything an agency does, "such as, for example, constructing a building, operating a program, or performing a contract." *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). Rather, the APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see* 5 U.S.C. § 701(b)(2). In

2

line with that definition, the Supreme Court has explained that the action at issue must be "circumscribed [and] discrete," *Norton v. SUWA*, 542 U.S. 55, 62 (2004), and must not require review of "the [agency's] day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). The agency action that *Armstrong* approved for challenge in the FRA context—a specific agency recordkeeping guideline or directive—comports with these criteria. *Armstrong I*, 924 F.2d at 293[1]; *Judicial Watch, Inc. v. FBI*, No. 18-2316, 2019 WL 4194501, at *3, 6 (D.D.C. Sept. 4, 2019) (challenge to "the adequacy of the FBI's recordkeeping policy for a specific category of records: electronic records, excluding email" was permissible). In *Pruitt*, this Court indicated an unwritten policy might also qualify—but only if it were similarly discrete. *See Pruitt*, 319 F. Supp. 3d at 261.

As this Court has recognized, neither *Armstrong* nor the APA allows challenges to "isolated acts" of agency employees that are "allegedly in violation" of FRA provisions, or to "the agency's day-to-day implementation of its guidelines." *Pompeo I*, 2020 WL 1667638, at *4 (internal quotation omitted). Such "compliance-based claims" would "impermissibly inject the court into the 'details of record management.'" *Id.* at *3. Also excluded from the permissible scope of APA review are "'broad programmatic attack[s]' on an agency's compliance with" the FRA. *CREW v. DHS*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019) (quoting *SUWA*, 542 U.S. at 64). Such attacks, requiring a court to assess whether the agency's recordkeeping program comports with a "broad statutory mandate," would lead to the same problem as the individual compliance-based claim, where "'the supervising court, rather than the agency,'" would have to "'work out compliance with the [FRA]'" in specific circumstances. *Id.* (quoting *SUWA*, 542 U.S. at 66-67).

---

[1] The second category of claims recognized in *Armstrong*, relating to administrative enforcement of records destruction pursuant to 44 U.S.C. § 3106, is not at issue here.

By any measure, Claim One is an impermissible compliance-based claim. *See* Def. Mem. [ECF 23] at 16-21. Defendants' opening brief identified three fatal defects in Claim One: (1) the Department's written policy complies with the FRA, *id.* at 17-18; (2) Plaintiffs' factual assertions do not suggest the existence of an unwritten recordkeeping policy that contradicts the Department's written policy, but instead allege isolated acts, most of which have nothing to do with recordkeeping at all, by a small number of individuals, *id.* at 18-21; and (3) Plaintiffs' request for relief mirrors the relief that this Court deemed impermissible in *CREW v. Wheeler*, 352 F. Supp. 3d 1, 5-6 (D.D.C. 2019), demonstrating a broad programmatic attack that lacks any judicially manageable standards, Def. Mem. at 27-29. Plaintiffs' opposition brief fails to show otherwise.

### A.    Plaintiffs Concede That the Department's Written Guidance—Which They Do Not Challenge—Complies With the FRA, and They Identify No Alternative Final Agency Action

As Defendants have explained, the court in *Competitive Enter. Inst. v. U.S. Envt'l. Prot. Agency* ("*CEI*"), 67 F. Supp. 3d 23 (D.D.C. 2014), identified the existence of an FRA-compliant written policy as a strong indicator that a plaintiff's challenge is an impermissible compliance-based claim. Def. Mem. at 17 (citing *CEI*, 67 F. Supp. 3d at 32). Although Plaintiffs attempt to distinguish *CEI*, they concede that the Department's official guidance complies with the FRA, Am. Compl. ¶¶ 26-27, and they also concede that "Defendants correctly note that *Armstrong* does 'not allow a plaintiff to proceed with a challenge to an agency's recordkeeping guidance where the guidance on its face complies with statutory requirements and there is no evidence of a contrary unwritten recordkeeping policy.'" Pl. Opp. [ECF 25] at 13 (quoting Def. Mem. at 21).[2]

---

[2] Plaintiffs also fail meaningfully to distinguish *CEI* from this case. The fact that the plaintiffs' claim in *CEI* was impermissible for *two* reasons—as a compliance-based claim and as a claim that was precluded by the administrative enforcement scheme for records destruction set forth in 44

The fact that Claim One does not challenge the Department's FRA-compliant written guidance is particularly significant because, as discussed above, that written guidance, if deficient in some specific respect, would typically qualify as the "final agency action" that could properly be challenged under the APA. Absent a challenge to a discrete written guideline, Plaintiffs have the burden to establish the existence of some other discrete final agency action as the object of their challenge, but their Amended Complaint fails to do so. *See* Def. Mem. at 16.

In their opposition, Plaintiffs never address this problem or attempt to explain what "final agency action" Claim One might challenge. Significantly, although Plaintiffs claim the existence of some nebulous, unwritten "policy and practice" that has something to do with "shadow" or "off-the-books" diplomacy, Pl. Opp. at 8, 9, they never articulate a discrete "policy and practice" that could possibly qualify as a "final agency action," and they do not even attempt to argue that the "policy and practice" that they seek to challenge is a "final agency action" for purposes of APA review. Instead, they gloss over the issue by citing cases, including *Garcia v. Acosta*, 393 F. Supp. 3d 94 (D.D.C. 2019), discussed in Defendants' opening brief, Def. Mem. at 24 n.8, where a plaintiff *had* challenged a "specific agency action" but, when that challenge became moot, were then able to invoke an exception to mootness by continuing to challenge the policy underlying that action. Pl. Opp. at 10 n.1. As Plaintiffs essentially concede, those cases do not help them here. The problem here is not that Plaintiffs challenge a final agency action that has become moot; the problem is that they fail to challenge final agency action in the first place.

Plaintiffs cite *Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988), Pl. Opp.

---

U.S.C. § 3106, *see CEI*, 67 F. Supp. 3d at 32-33—in no way undermines that court's reasoning with respect to compliance-based claims. Plaintiffs fail to support the notion that the existence of a written policy would somehow be less relevant when a plaintiff seeks to assert the existence of an unwritten policy that relates to records creation rather than records destruction.

at 14, but as discussed in Defendants' opening brief, *Payne* was a FOIA case, not an APA case, so the question of a "final agency action" was not at issue. Def. Mem. at 23. Moreover, even in *Payne*, the court did not suggest that the plaintiff could challenge an alleged "policy or practice" at the outset in the absence of any FOIA request—the statutory prerequisite for a FOIA cause of action. Alleging a "policy or practice" in the APA context similarly cannot excuse a failure to identify a final agency action—the statutory prerequisite for APA claims. The only case cited by Plaintiffs that did address the final agency action issue, *Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), is inapposite because, contrary to Plaintiffs' description, Pl. Opp. at 14, the plaintiffs there did not seek to challenge an "unwritten policy" at all. Instead, the discrete policy at issue there—permitting employees to disclose confidential information without notice—was written, albeit in a compliance manual. The court held that the policy qualified as a final agency action because it represented the consummation of an agency's decisionmaking process even though it was set forth in a manual that otherwise qualified as internal guidance. *See Venetian Casino Resort LLC*, 530 F.3d. at 931.

Plaintiffs otherwise appear to rely on *Armstrong*'s reference to "informal, supplementary guidance," Pl. Opp. at 14, but that reference in no way excuses Plaintiffs' failure to challenge a final agency action. To the contrary, *Armstrong* assumed that the original challenge would be to a discrete written guideline or directive, and only if the guideline or directive were deficient on its face would such *supplementary* guidance become relevant. *Armstrong*, 924 F.2d at 297. In other words, such supplementary guidance might cure a defective formal policy once a plaintiff had sufficiently stated a claim in the first instance. *See* Def. Mem. at 21-22 (citing *Armstrong I*, 924 F.2d at 297). Nothing in *Armstrong* indicates that the speculative prospect of such guidance suffices to satisfy the APA's final agency action requirement or otherwise to state a claim. *See*

*Armstrong I*, 924 F.2d at 297.

Here, Plaintiffs' Amended Complaint does not allege the existence of "informal, supplementary guidance," much less attempt to challenge such guidance. Plaintiffs' suggestion in their opposition brief that, despite the Department's FRA-compliant official guidance, the Department may have non-compliant "informal, supplementary guidance," Pl. Opp. at 14, is thus an improper attempt to amend their Amended Complaint through briefing. *See Sai v. TSA*, 326 F.R.D. 31, 33 (D.D.C. 2018) (It is axiomatic . . . that a party may not amend his complaint through an opposition brief."(internal quotation omitted)). It is also mere speculation, and *Armstrong* does not support allowing an FRA claim to proceed simply so that a plaintiff can hunt through an agency's files for such material. Plaintiffs therefore fail to overcome the significance of the fact that, as they concede, the Department has a facially compliant records creation policy, and they fail to identify any substitute "final agency action" properly subject to an APA claim.

### B.  Plaintiffs' Factual Assertions Do Not Describe a Recordkeeping Policy or Practice and Instead Demonstrate That Claim One Is Compliance-Based

Plaintiffs' factual allegations also fail to support the notion that the Department follows a concrete "policy and practice" that would qualify as a final agency action. No non-compliant "policy" can be inferred based on Plaintiffs' factual assertions. As Defendants have explained, the bar for drawing such an inference is necessarily high in order to prevent plaintiffs from bootstrapping impermissible compliance-based claims into guidelines-based claims—as this Court concluded was the case in Plaintiffs' original Complaint, *cf. Pompeo I*, 2020 WL 1667638—and from circumventing the APA's "final agency action" limitation.. *See* Def. Mem. at 16. Plaintiffs fail to meet that high bar. Instead, like the original Complaint's Claim One, the Amended Complaint's Claim One is an impermissible compliance-based claim.

Two rare cases where courts have concluded an unwritten policy might qualify as a final

agency action provide a useful contrast to the factual assertions here. In *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018), the court was careful to explain that the plaintiff had not set forth an impermissible broad programmatic challenge, but instead identified a "cabined and direct" policy "of authorizing long-term [H-2A] visas" for temporary or seasonal workers. *Id.* at 386, 388. In *Pruitt*, this Court also allowed an FRA-based APA claim alleging an unwritten policy to proceed. *Pruitt*, 319 F. Supp. 3d at 255. But there, the allegations set forth in the complaint were not simply a haphazard collection of actions by various agency employees unrelated to recordkeeping. Instead, they presented a coherent picture of the EPA Administrator's adoption of a specific unwritten policy "not to create a written record about major substantive matters," with numerous factual details of steps taken by the Administrator himself to support that assertion—including the Administrator's own verbal instructions not to create records, his outright prohibition on using phones or taking notes during meetings, using telephones other than his own to make important calls, avoiding email entirely, and commissioning a soundproof privacy booth. *Id.*

The assertions in Plaintiffs' Amended Complaint continue to be "a far cry from those found sufficient" in these cases. *See Pompeo I*, 2020 WL 1667638, at *6. This conclusion is clear, most notably, from the fact that, even after this Court dismissed Plaintiffs' original Claim One as an impermissible compliance-based claim, Plaintiffs' new Claim One continues to focus on "a few isolated actions involv[ing] some State Department personnel." *See id.* at *5. Indeed, as before, the single alleged action by any Department official that has any conceivable connection to an alleged failure to create records is that of now-former Ambassador Sondland, who allegedly directed participants not to take notes "during *one* phone call." *Id.* at *6 (emphasis in original).[3]

---

[3] As noted in Defendants' opening brief, former Ambassador Taylor, who testified regarding this statement, apparently did not interpret it as prohibiting the creation of any record documenting the call, as he "wrote a memo for the record" summarizing the conversation. *See* Def. Mem. at 20 n.6.

Plaintiffs' opposition brief fails to show otherwise. Indeed, the four supposed "examples" upon which Plaintiffs rely to "illustrate the challenged policy and practice," Pl. Opp. at 9-10, entirely fail to suggest a coherent "policy and practice" at all, much less the equivalent of a recordkeeping guideline or directive that plausibly violates the FRA. Instead, Plaintiffs pad their Amended Complaint with allegations that have nothing to do with the Department's records creation obligations under the FRA—the ostensible subject of their Claim One—or at best repeat the same  compliance-based allegations that this Court has already rejected.

First, Plaintiffs identify the same alleged "shadow" diplomacy that was the focus of their original Complaint, involving the same three now-former State Department officials. *See* Pl. Opp. at 9-10 (citing Am. Compl. ¶¶ 42-54). As Defendants have explained, the only difference between Plaintiffs' description in the Amended Complaint and that in the original Complaint that the Court deemed insufficient is that Plaintiffs now contend that Secretary Pompeo "played an active and knowing role"—not in the formulation of any recordkeeping policy, but in the "shadow diplomacy" that continues to be Plaintiffs' chief concern. Pl. Opp. at 5 (quoting Am. Compl. ¶ 48). But even this contention—which is of little relevance here—lacks any meaningful support. Indeed, Plaintiffs continue to assert that it was not Secretary Pompeo but former Mayor Giuliani—who was never a Department employee—who led the "irregular policy channel," and that "[p]articipants in the regular diplomatic channel were kept in the dark." *Id.*

Plaintiffs' specific assertions do not support their broad contention about the Secretary's role, nor do they suggest any connection to FRA violations. Plaintiffs assert that the Secretary was "in the loop" on actions carried out by others who never were in, or have now left, the Department—a contention that they support by double-counting the same single statement

originally made by former Ambassador Sondland. Am. Compl. ¶¶ 49, 50; Def. Mem. at 19 & n.5.[4]

And Ambassador Sondland based that statement solely on the fact that the Secretary, along with

others, was identified in the address fields of certain emails (which themselves are a form of written

record). Am. Compl. ¶ 50. Plaintiffs also assert that the Secretary "listened in" on a call between

the President and President Zelenskyy—a call for which, by Plaintiffs' own description, a record,

in the form of a written transcript, exists. *E.g.*, Am. Compl. ¶¶ 39-40.[5] Plaintiffs' other assertions

regarding the Secretary similarly fail to identify FRA violations; instead, they rely on written

communications to or from the Secretary (who, unlike the EPA Administrator in *Pruitt*, evidently

does use email)—and are thus entirely inconsistent with the notion that the Secretary had a policy

that Department employees should not create written records. Pl. Opp. at 6 (citing Am. Compl.

¶¶ 51-52, describing a written cable sent to the Secretary by former Ambassador Taylor, and

communications between Sondland and the Secretary that, according to the cited House Report,

took place by email); *see* House Rpt. at 127 (quoting emails).

Plaintiffs also seek to rely on communications that did not involve the Secretary at all, but

involved the same three former Department employees who are the only former or current

Department officials, other than the Secretary, identified in the Amended Complaint. Even those

communications fail to reflect individual failures to comply with the FRA, much less a policy not

to do so. For example, Plaintiffs seek to rely on suggestions by Sondland that another individual

---

[4] Plaintiffs continue to claim that former Ambassador Sondland "corroborated" the House Report, Pl. Opp. at 6, even in the face of Defendants' showing that the House Report itself relied on Sondland's statement. *See* Def. Mem. at 19 n.5 (citing House Rpt. at 91). In other words, Sondland made the assertion once, and the House Report then quoted it. That does not count as corroboration.

[5] Although Plaintiffs suggest, as they did in their original complaint, that there was "abuse[] [of] recordkeeping systems" in connection with this call, nothing that they describe implicates the FRA (which does not govern where records of the President's calls, or any records, should be stored), much less qualifies as a FRA violation. *Id.* ¶ 39.

"call [him]" or "stop the back and forth by text." Pl. Opp. at 6. Unlike the EPA Administrator's unambiguous instruction not to create written records that was described in *Pruitt*, there are many reasons, having nothing to do with a policy of not creating records required under the FRA, that someone might prefer to speak by telephone or stop repeated rounds of texting. Nothing in these communications conveys a message that adequate documentation should not be maintained. Indeed, the FRA does not require agency employees to communicate with each other in writing, and communicating with each other by telephone, or even in person, does not prevent employees from creating adequate documentation of Department activities.

Second, Plaintiffs rely on supposed "off-the-books diplomacy Secretary Pompeo participated in with Russian Foreign Minister Sergey Lavrov." Pl. Opp. at 10. Plaintiffs first mentioned the Secretary's meeting with Mr. Lavrov, and suggested it was relevant to their claimed FRA violations, in their first opposition brief. The Court pointed to those assertions when granting Plaintiffs leave to amend. *Pompeo I*, 2020 WL 1667638, at *7 (citing Pl. Opp. to Mot. to Dismiss [ECF 17], at 18). However, the allegations about this meeting that Plaintiffs added to their Amended Complaint in no way suggest an FRA violation, nor do they plausibly allege "off the-books diplomacy"—whatever Plaintiffs intend that phrase to convey. Plaintiffs do not allege that the Department failed to create adequate documentation of this meeting, nor do they assert any facts from which such an inference might be drawn. Instead, Plaintiffs merely allege that Secretary Pompeo did not inform journalists of the meeting or hold a press conference. *See* Am. Compl. ¶ 55. These assertions are irrelevant to any supposed recordkeeping policy or practice because the FRA does not require agency officials to disclose their activities to the press. The FRA relates to an agency's internal recordkeeping practices; it imposes no obligations of public disclosure. It is entirely possible for an agency to comply with FRA recordkeeping requirements without holding

press conferences.[6]

Third, Plaintiffs rely on supposed "off-the-books calls Secretary Pompeo participated in with Russian President Vladmir Putin, Saudi King Salman bin Abdulaziz Al Saud, and Saudi Crown Prince Mohammed bin Salman." Pl. Opp. at 10. Again, their Amended Complaint does not plausibly allege any FRA violation with respect to such calls. It merely alleges that Secretary Pompeo was "present" during calls between the President and foreign leaders and cites a newspaper article reporting unnamed sources as saying that no transcripts were created for some of those calls. Am. Compl. ¶ 56. The article itself reported that the purpose of not creating written transcripts was "to prevent leaks" about the President's conversations and suggested that this effort was being made by the White House, not by the Department.[7]  As recently recognized in another case brought by Plaintiffs, any obligation of the President to create records of his meetings with foreign leaders is governed not by the FRA but by the Presidential Records Act ("PRA"), 44 U.S.C. § 2203—a statutory scheme that is entirely separate from the FRA, *Armstrong v. Exec. Office of the President* ("*Armstrong II*")*,* 1 F.3d 1274, 1290 (D.C. Cir. 1993), and that does not allow for

---

[6] Nor does any other statute require Department officials to keep the news media apprised in real time of diplomatic discussions or meetings or provide access to diplomatic officials. There is nothing inappropriate about conducting diplomatic negotiations confidentially. To the contrary, there are many circumstances where confidentiality may be important to achieve foreign policy goals. The question of how best to conduct diplomacy is outside the scope of the FRA and well within the Executive Branch's discretion. *United States v. Curtiss-Wright Exp. Corp*., 299 U.S. 304, 320 (1936) (recognizing the President's "plenary and exclusive power" to act "as the sole organ of the federal government" in negotiating treaties); *Zivotofsky ex rel. Zivotofsy v. Kerry*, 135 S. Ct. 2076, 2086 (2015) (recognizing the President's exclusive authority to recognize foreign governments because on such matters, "the Nation must 'speak . . . with one voice,'" and "[t]hat voice must be the President's" (internal quotation and citation omitted)); *see also PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 107 (D.C. Cir. 2018) ("'The President has broad authority in the field of foreign affairs.'").

[7] *See White House restricted access to Trump's calls with Putin and Saudi crown prince*, CNN (Sept. 28, 2019), *available at* cnn.com/2019/09/27/politics/white-house-restricted-trump-calls-putin-saudi/index.html .

judicial review of such issues. *See CREW v. Trump*, 438 F. Supp. 3d 54 (D.D.C. 2020), *appeal pending*, No. 20-5037 (D.C. Cir.). Plaintiffs' assertions thus do nothing to bolster the existence of any particular recordkeeping policy or practice within the Department, much less one that would be inconsistent with FRA obligations.[8]

Finally, Plaintiffs rely on the alleged "widespread use by State Department officials" of "encrypted messenger apps, including communications concerning efforts to pressure Ukraine, without placing those messages in agency record keeping systems." Pl. Opp. at 10. However, the issue that Plaintiffs attempt to raise regarding the preservation of messages sent through messenger apps falls under Claim Two, *see* Am. Compl. ¶¶ 78, 80, which, as Defendants have explained, fails to state a claim and is moot, given the Department's current recordkeeping policy that specifically addresses the use of such apps. Def. Mem. at 29-33. Plaintiffs' Amended Complaint does not mention the use of messenger apps in connection with Claim One. *See* Am. Compl. ¶¶ 70-75. Nor is any violation of FRA records creation requirements—or of any FRA requirements—apparent from Plaintiffs' description. At best, Plaintiffs' allegations regarding the use of messenger apps by the same three former Department employees who Plaintiffs have identified as engaging in "shadow diplomacy" simply relates to the same compliance-based claim as the first category of allegations.

These four separate categories—each lacking on its own for different reasons—fail to come

---

[8] The Amended Complaint asserts that the Secretary has "an independent duty under the FRA to create records of essential transactions including conversations with foreign leaders," Am. Compl. ¶ 57, but Plaintiffs neither support the notion that the Secretary was required to create records of the meetings they identify, nor do they support their suggested inference that any such obligation was not fulfilled. Plaintiffs' assertions thus qualify as "'naked assertion[s]' devoid of 'further factual enhancement'" that is insufficient to withstand Defendants' Motion to Dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

together to "illustrate" any coherent "policy and practice" of the Department as a whole. *Cf.* Pl.

Opp. at 9. As with their original Complaint, Plaintiffs fail to show the "same sort of systemic non-

compliance" that this Court found sufficient in Pruitt, nor do they plausibly describe "a policy

orchestrated from the highest levels." *Pompeo I*, 2020 WL 1667638, at *6. Nor do Plaintiffs

demonstrate the existence of a "policy and practice" on the sweeping scale that Plaintiffs allege,

"of affirmatively electing not to create and preserve records adequately documenting all

organizations, functions, policies, decisions, procedures, and essential transactions of the State

Department." *See* Pl. Opp. at 9.

Plaintiffs argue that their assertions are sufficient to withstand a motion to dismiss because

they have also asserted unspecified broad, ongoing FRA violations "on information and belief."

*See* Am. Compl. ¶¶ 57, 59. They suggest that they are entitled to conduct discovery so that they

might uncover "evidence of additional recordkeeping failures—currently unknown to the public."

Pl. Opp. at 16. However, there is a vast chasm between the deficient factual allegations described

above—where only a single incident by one former Department employee conceivably implicates

the FRA—and an alleged agency-wide failure of "senior State Department officials [to] create

records of essential transactions." Am. Compl. ¶ 57. The former cannot possibly suffice to support

an inference of the latter. Moreover, Plaintiffs' theory that current Department officials engage in

"shadow, off-the-books diplomacy" in order to "ensure[] that no records . . . exist," appears aimed

at using the FRA as a tool to explore other forms of alleged agency wrongdoing that are entirely

beyond the scope of the FRA and are themselves speculative. Plaintiffs cite no case where a court

has allowed an FRA claim to proceed with a similar dearth of factual support, or for a similar

purpose.

To the contrary, even in the cases Plaintiffs cite outside the FRA context where courts accepted allegations made on "information and belief," the complaints included some "specific information" that would allow the Government to identify concrete incidents that the plaintiffs were attempting to reference. *Bancroft Global Dev. v. United States*, 330 F. Supp. 3d 82, 102 (D.D.C. 2018) (name of individual to whom improper disclosure was allegedly made, and approximate timeframe, was identified even though specific dates were unknown); *see also Evangelou v. Dist. of Columbia,* 901 F. Supp. 2d 159, 170 (D.D.C. 2012) (plaintiff identified specific facts and only sought to draw an inference "on information and belief" regarding former employer's motivation for terminating him). The limited nature of "information and belief" assertions in those cases is far different from Plaintiffs' sweeping allegations here. Plaintiffs ask the Court to approve an agency-wide fishing expedition based on a single statement by former Ambassador Sondland about "*one* phone call." *Pompeo I*, 2020 WL 1667638, at *6.

In sum, the limited facts that Plaintiffs assert are wholly insufficient to make their "information and belief" assertions regarding a Department "policy and practice" plausible under *Iqbal* or *Twombly*. *See Iqbal*, 556 U.S. at 678 (allowing only for "reasonable" inferences and rejecting sufficiency of "naked assertion[s]' devoid of 'further factual enhancement'"). Nor do these assertions plausibly identify a "final agency action" properly subject to an APA challenge. Claim One should therefore be dismissed as an impermissible compliance-based claim.

### C.   Plaintiffs' Requested Relief Is Identical to That Deemed Inappropriate in *Wheeler* and Reflects a Broad Programmatic Challenge to Which No Judicially Manageable Standards Apply

This Court has identified another straightforward way to identify an impermissible compliance-based claim, by looking at the relief sought, and rejecting those that "go beyond demanding that [an agency] issue a new policy and instead monitor its compliance by compelling [the agency] to make and preserve a broad swath of records." *Wheeler*, 352 F. Supp. 3d at 6. As

15

explained in Defendants' opening brief, Def. Mem. at 15, 28, Claim One seeks the very relief that this Court in *Wheeler* deemed inappropriate, asking the Court for an order "compelling [Defendants] to make and preserve as federal records all records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the State Department." Am. Compl. ¶ 75; *see id.* at 29.

In their opposition, Plaintiffs ignore the import of this Court's holding in *Wheeler*, and the fact that their request for relief here virtually duplicates the request found inappropriate in that case. Instead, Plaintiffs insist that their requested relief is narrow because they complain that Defendants have allegedly "fail[ed] to create records at all." Pl. Opp. at 21. Plaintiffs' argument here makes little sense, particularly when, as discussed above, Plaintiffs' assertions rely on numerous Department records and written communications between Department employees. Moreover, those assertions only touch on activities of three former Department employees and the Secretary. Plaintiffs nowhere suggest that Department employees in general never create any records, and there can be little doubt that records are being created every day—in compliance with the Department's written recordkeeping policies and guidance—by tens of thousands of Department employees all over the world. Indisputably, then, the Department does create records, and Plaintiffs' assertion that, in their view, the Court need only order the Department to create records, and that this would not lead to countless questions of what qualifies as "adequate" in particular circumstances, is disingenuous at best.

Plaintiffs' failure to distinguish meaningfully their requested relief here from that in *Wheeler* reflects the problems inherent in their claim. As Defendants have explained, there are no judicially manageable standards applicable to their broad assertion that the Department has failed to create records adequately documenting all agency activities. Def. Mem. at 25-29. Plaintiffs

again have no answer to this. Most tellingly, they do not identify the standard that they would have the Court apply to their claim, beyond the broad language of 44 U.S.C. § 3101 itself, which requires documentation to be "adequate" but leaves to agency discretion what adequacy might mean in any specific context. *See* Pl. Opp. at 22.[9] Plaintiffs again rely on the notion that they challenge a "policy and practice of affirmatively failing to create records ab initio," Pl. Opp. at 22, but § 3101 does not require the creation of records in all circumstances. Rather, as Defendants have explained, "adequate" documentation may in many instances mean that specific conversations or meetings are documented only by a calendar entry, or not documented at all. *See* Def. Mem. at 28–29. Plaintiffs' attempt to identify a clear dichotomy between creating records and not creating records is thus inevitably flawed.

Moreover, by framing their claim so broadly, and failing to identify any narrower unwritten "policy" that allegedly superseded the Department's written, FRA-compliant policy, Plaintiffs seek to assert the very kind of "broad programmatic challenge" that the court in *DHS* rejected,

---

[9] On a single page more than halfway through their opposition brief, Plaintiffs for the first time suggest that they seek to challenge "an unlawful policy and practice of concealing the existence and contents of the president's one-on-one meetings with foreign leaders." Pl. Opp. at 24. But this suggestion serves to confuse rather than clarify their claim. Their Amended Complaint identifies no such policy, nor do the assertions in the Amended Complaint support the existence of such a policy. Indeed, Plaintiffs fail to identify a single instance where the existence of the President's meeting with a foreign leader was concealed, and the only references in the Amended Complaint to such meetings merely assert that the Secretary listened in on some of them. And as discussed above, for at least one of those meetings, a record indisputably exists. Moreover, Claim One, by its plain terms, challenges an ostensible agency-wide "policy and practice of affirmatively electing not to create and preserve records adequately documenting" agency activities. Am. Compl. ¶ 71. Claim One does not mention the President's meetings. Although Claim One asserts that, "[i]n certain instances, this is being done to keep the shadow diplomacy being conducted in furtherance of the President's personal and political interests a secret," *id.*, Plaintiffs make no attempt to limit Claim One to that context. In any event, there is no reason to conclude that the applicable standard for such an assertion would be any narrower than § 3101 itself; the Court would still be called upon to determine what "adequate documentation" entails in specific contexts.

recognizing that such a claim would inappropriately "inject[] the judge into day-to-day agency management" by empowering him to decide just how much detail is necessary," in any circumstance, to satisfy the adequate documentation requirement of § 3101. *DHS*, 387 F. Supp. 3d at 51.[10] Plaintiffs attempt to distinguish *DHS* by suggesting the claim at issue there was narrower than the one here. Pl. Opp. at 23 (arguing that their claim broadly challenges an "unofficial State Department policy and practice of affirmatively electing not to create records of essential agency transactions and communications").[11] But both *DHS* and this case allege failures to create records in compliance with § 3101, and the court in *DHS* expressly recognized that an allegation that an agency has failed to comply with the "general requirements" of § 3101 is a "'deficienc[y] in compliance] with a broad statutory mandate that 'lack[s] the specificity requisite for agency action.'" *DHS*, 387 F. Supp. 3d at 51 (quoting *SUWA*, 542 U.S. at 66). That holding, leading the court to dismiss the plaintiffs' claims in that case, is directly on point here and supports a similar dismissal of Claim One.

## II.   CLAIM TWO SHOULD ALSO BE DISMISSED

As discussed in Defendants' opening brief, Claim Two of Plaintiffs' Amended Complaint should also be dismissed. Def. Mem. at 29-31. For one thing, any challenge to the Department's former written recordkeeping policy regarding personal devices and electronic messaging

---

[10] As the court in another case recently recognized, the D.C. Circuit has held that even the question of "whether a document *qualifies* as a federal record" is "a matter of agency discretion." *Democracy Forward Found. v. Pompeo*, No. 19-1773, 2020 WL 4219817, at *5 (D.D.C. July 23, 2020).

[11] To the extent Plaintiffs are arguing that Claim One cannot be compliance-based *because* it is a broad programmatic attack, that argument misunderstands that broad programmatic challenges are also impermissible because they, like compliance-based challenges to isolated acts, inject the Court into an agency's day-to-day operations. *DHS*, 387 F. Supp. 3d at 51, 54. As discussed above, broad programmatic challenges are equally impermissible, *SUWA*, 542 U.S. at 67, and are no more amenable to review "simply by slapping the 'policy or practice' label on [them]." *Pompeo I*, 2020 WL 1667638, at *5.

applications, as set forth in the Department's Foreign Affairs Manual ("FAM"), has been rendered moot by revisions to the FAM after Plaintiffs filed their Amended Complaint. *See id.* at 7 (citing 5 FAM 444), 29. In addition, the Amended Complaint fails to allege facts that could plausibly lead the Court to find that policy arbitrary or capricious. *See Pompeo I*, 2020 WL 1667639, at *6; *Judicial Watch, Inc.*, 2019 WL 4194501, at *6, 10. Claim Two seeks to rely on an unsupported allegation of "widespread non-compliance" with recordkeeping requirements applicable to such technology as evidence of a "lack of effective controls," Am. Compl. ¶¶ 78-79, but courts have rejected the notion that such allegations suffice to state a plausible challenge to an agency's recordkeeping policy. *See Judicial Watch, Inc.*, 2019 WL 4194501, at *6.

In their opposition, Plaintiffs appear to concede that the Department's written guidance, as revised, fully complies with the FRA. Instead of abandoning Claim Two as moot, however, they now assert that this claim was meant to raise a far broader challenge that "reaches beyond the written guidance" regarding the use of personal devices and electronic messaging applications to the Department's entire recordkeeping program. *See* Pl. Opp. at 24-25 (identifying claim "that the State Department has unlawfully failed to establish and maintain an adequate program to preserve federal records, in violation of the FRA, 44 U.S.C. §§ 3102, 3105, and associated NARA regulations, 36 C.F.R. §§ 1220.32, 1220.34"). In support of their new programmatic challenge, they rely in their brief on the same factual assertions regarding "shadow diplomacy" that they cite in support of Claim One. *Id.* at 28-30. Indeed, Plaintiffs' characterization of Claim Two in their opposition brief largely mirrors their description of Claim One, and their argument does not reference the use of electronic messaging applications by Department employees at all.

This complete transformation of Claim Two in Plaintiffs' brief does not save it from dismissal. As set forth in the Amended Complaint, Claim Two focuses on an alleged "fail[ure] to

enact adequate guidelines concerning the use of private phones and email accounts and non-governmental electronic messaging applications." Am. Compl. ¶ 78; *see also id.* ¶ 80 (alleging an "absence of guidance and . . . ambiguity in the State Department's rules and policies on the use of personal devices, non-governmental electronic messaging applications, and the retention of federal records created using such applications"). "It is axiomatic . . . that a party may not amend his complaint through an opposition brief." *See Sai*, 326 F.R.D. at 33 (internal quotation omitted) (rejecting plaintiff's attempts to "add a new claim not encompassed by [the plaintiff's prior pleading" and to "clarify" a claim in a way that would fundamentally change it). Plaintiffs' failure to defend Claim Two as written amounts to a concession that it should be dismissed. *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 268 F. Supp. 3d 61, 72 (D.D.C. 2017) ("a court may treat those arguments that the plaintiff failed to address [in opposition to a motion to dismiss] as conceded" (internal quotation omitted)).[12]

        In addition, Plaintiffs' attempt to assert a "broad programmatic attack" on the Department's recordkeeping program is no more cognizable in Claim Two than it is in Claim One. *See DHS*, 387 F. Supp. 3d at 49. Plaintiffs mischaracterize the claims at issue in *Judicial Watch, Inc.* and *Pruitt* as raising similar "challenges to the adequacy of an agency's records management program and controls." Pl. Opp. at 25. Contrary to Plaintiffs' description, both cases involved far narrower claims—to specific policies or guidelines that qualified as a discrete "final agency action" for

---

[12] In eschewing any intent to focus on electronic messaging applications in Claim Two, Plaintiffs focus on the Claim Two heading as well as the requested relief. Pl. Opp. at 24-25. But Plaintiffs' original complaint had the same heading and the same requested relief, yet Plaintiffs acknowledged in opposition to Defendants' original motion to dismiss that Claim Two sought to focus on Department employees' use of private phones, email accounts, and encrypted messenger apps. Pl. Opp. to Mot. to Dismiss [ECF 17], at 23 (citing Compl. ¶¶ 77-78). The Court also recognized Claim Two as challenging the Department's recordkeeping guidelines, "most notably, guidelines pertaining to modern technology." *Pompeo I*, 2020 WL 1667638, at *6.

purposes of APA review. In *Judicial Watch*, although the plaintiff used the word "program" in describing its challenge, the court construed the claim as "expressly contest[ing] the adequacy of the FBI's recordkeeping policy for a specific category of records: electronic records, excluding email." *Judicial Watch, Inc*., 2019 WL 4194501, at *6.  It further clarified that the claim was limited to the agency's "official Policy Guidelines," which the court had explained consisted of a written guidance manual. *Id.*  at *3, 6. The court in *Judicial Watch* then dismissed the plaintiff's claim because the plaintiff had failed to specifically identify any defects in the written guidelines regarding electronic records. *Id.* at *9-10. The claim this Court recognized in *Pruitt*, though it alleged an unwritten recordkeeping policy, was similarly limited to a specific policy of "refusing to create certain records." *Pruitt*, 319 F. Supp. 3d at 260. Thus, neither case approved a "broad programmatic attack" on an agency's recordkeeping program, and the court in *Judicial Watch* expressly distinguished the case before it from *DHS*, where the court had rejected such an attack. *Judicial Watch*, 2019 WL 4194501, at *6 ("Judicial Watch is not trying to make 'a broad programmatic attack' on the FBI's compliance with the FRA") (quoting *DHS*, 387 F. Supp. 3d at 48-49)).

Claim Two, as now revised by Plaintiffs, on the other hand, clearly does seek to assert an impermissible broad programmatic attack. Plaintiffs now allege that this claim "reaches beyond the written guidance" and "seeks to enforce" the blanket obligation "to 'establish and maintain an active, continuing program for the economical and efficient management of the records of the agency.'" Pl. Opp. at 25 (quoting 44 U.S.C. § 3102); *see id.* (relying on "allegations that senior State Department officials . . .  have knowingly participated in or sanctioned policies and practices that flout the FRA" to assert that the Department's entire "records management *program*," including its "guidance, training, and evaluation," are at issue); *see id.* at 26 (repeating that

Plaintiffs now construe Claim Two as challenging the Department's "recordkeeping program or controls, not just their written policies"). This is precisely the type of claim that the court in *DHS* rejected as impermissible under the APA and Supreme Court authority. *See DHS*, 387 F. Supp. 3d at 54 (dismissing claim alleging agency's "failure 'to establish and maintain a sufficient agency-wide records management program in compliance with the FRA and its implementing regulations'" as a "broad programmatic attack" that the court "simply cannot consider under the APA" (citing *SUWA*, 542 U.S. at 67; *Lujan*, 497 U.S. at 891). The relief they seek with respect to Claim Two (like that sought for Claim One) is also the very same type of relief that this Court has recognized is impermissible—"go[ing] beyond demanding that the Agency issue a new policy and instead monitor its compliance by compelling [the Agency] to make and preserve a broad swath of records." *Wheeler*, 352 F. Supp. 3d at 5 (internal quotation omitted).  Plaintiffs are thus entirely wrong when they claim that "Claim Two states a justiciable claim for relief *because* it challenges Defendants' recordkeeping program or controls, not just their written policies." Pl. Opp. at 26 (emphasis added). In fact, the opposite is true, and the broad programmatic challenge that Plaintiffs now seek to assert in Claim Two is not justiciable under the APA.

Plaintiffs also err in suggesting that their assertions of "shadow" and "off-the-books" diplomacy suffice to state a claim of "systemic deficiencies" in Department recordkeeping. The same deficiencies discussed above, with respect to the four categories of assertions upon which Plaintiffs seek to rely, apply here, now that Plaintiffs' two claims are virtually indistinguishable. Although Plaintiffs reel off a list of recordkeeping obligations under the FRA, *see* Pl. Opp. at 29-30, none of their factual assertions bear on those obligations in any discernible way. To the contrary, as discussed above, Plaintiffs' assertions have little, if anything, to do with recordkeeping at all, and they fail to identify even a single FRA violation. Thus, by any measure, Plaintiffs fail

to plausibly allege a cognizable claim of FRA violation under the APA, and the far-ranging discovery that they propose, which they suggest could "substantiate" unidentified FRA violations that they speculate might exist, Pl. Opp. at 30, is inappropriate. Claim Two, whether in its original form or as Plaintiffs now attempt to revise it, should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons and those set forth in Defendants' opening brief, the Court should dismiss Plaintiffs' claims in their entirety, with prejudice.

Dated:  August 13, 2020                    Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Kathryn L. Wyer*
KATHRYN L. WYER
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

23